UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEXIA SA/NV, DEXIA HOLDINGS, INC., FSA ASSET MANAGEMENT LLC, and DEXIA CREDIT LOCAL SA,<br><br>                              Plaintiffs,<br><br>                    - against -<br><br>DEUTSCHE BANK AG, DEUTSCHE BANK SECURITIES INC., DB STRUCTURED PRODUCTS INC., ACE SECURITIES CORP., and DEUTSCHE ALT-A SECURITIES INC.,<br><br>                              Defendants. | 11 Civ. 5672 (JSR) |
| TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA,<br><br>                              Plaintiffs,<br><br>                    - against -<br><br>DEUTSCHE BANK AG, DEUTSCHE BANK SECURITIES INC., DB STRUCTURED PRODUCTS INC., ACE SECURITIES CORP., and DEUTSCHE ALT-A SECURITIES INC.,<br><br>                              Defendants. | 11 Civ. 6141 (JSR) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
(212) 373-3000

*Attorneys for Defendants Deutsche Bank AG, Deutsche Bank Securities Inc., DB Structured Products Inc., Ace Securities Corp., and Deutsche Alt-A Securities Inc.*

March 21, 2013

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................... ii

TABLE OF ABBREVIATIONS ............................................................................................... vi

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS AND ALLEGATIONS.................................................................... 4

ARGUMENT .............................................................................................................................. 8

I.       THE AMENDED COMPLAINTS FAIL TO PLEAD ACTUAL
         RELIANCE.................................................................................................................... 8

         A.       Plaintiffs Fail to Allege with Particularity that They Actually Read
                  and Relied on Any False Statement for Any of the Offerings.................... 9

         B.       Plaintiffs Otherwise Fail to Allege Any False Statements on which
                  They Actually Relied ............................................................................... 14

                  1.       Plaintiffs Fail to Allege Non-Conformity with Underwriting
                           Guidelines ................................................................................... 14

                  2.       Plaintiffs Cannot Establish that the Credit Ratings Were
                           Fraudulent ................................................................................... 17

                  3.       The Allegations of False Computational Data Also Fail ............. 20

II.      PLAINTIFFS FAIL TO PLEAD JUSTIFIABLE RELIANCE ........................... 24

         A.       Plaintiffs Are Highly Sophisticated Investors and Had Access to
                  Voluminous Information About the Allegedly Undisclosed Risks .......... 24

         B.       Based on the Available Information, Plaintiffs' Reliance Was Not
                  Justified ................................................................................................... 27

III.     PLAINTIFFS FAIL TO PLEAD THE OTHER ELEMENTS OF FRAUD,
         AND DO NOT STATE A CLAIM FOR NEGLIGENT
         MISREPRESENTATION............................................................................................ 28

         A.       Plaintiffs Fail to Plead Scienter, Loss Causation, and Damages ............. 28

         B.       Plaintiffs Fail to State a Claim for Negligent Misrepresentation............. 30

IV.      THE DEXIA PLAINTIFFS DO NOT HAVE STANDING................................. 30

         A.       FSAM Suffered No Injury ........................................................................ 30

         B.       The Dexia Entities Do Not Have Standing............................................... 31

         C.       Equitable Subrogation Principles Do Not Save the Dexia Entities'
                  Claims ..................................................................................................... 33

CONCLUSION..................................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*627 Acquisition Co.* v. *627 Greenwich, LLC*,
   85 A.D.3d 645 (1st Dep't 2011) .................................................................23

*Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co. Inc.*,
   651 F. Supp. 2d 155 (S.D.N.Y. 2009)........................................................29

*Am. Fin. Int'l Group-Asia, L.L.C.* v. *Bennett*,
   2007 WL 1732427 (S.D.N.Y. June 14, 2007) ...........................................14

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007)........................................................................5, 8

*Banque Arabe et Internationale D'Investissement* v. *Maryland Nat'l Bank*,
   57 F.3d 146 (2d Cir. 1995).........................................................................32

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
   851 F. Supp. 2d 746 (S.D.N.Y. 2012)........................................................18

*Bell Atl. Corp.* v. *Twombly*,
   550 U.S. 544 (2007)......................................................................................8

*Bermuda Trust Co. Ltd.* v. *Ameropan Oil Corp.*,
   266 A.D.2d 251 (2d Dep't 1999) ...............................................................34

*Cal. Pub. Empls.' Ret. Sys.* v. *Shearman & Sterling*,
   95 N.Y.2d 427 (2000) .................................................................................32

*Centro Empresarial Cempresa S.A.* v. *Am. Movil S.A.B. de C.V.*,
   17 N.Y.3d 269 (2011) ...................................................................................9

*Chambers* v. *Time Warner, Inc.*,
   282 F.3d 147 (2d Cir. 2002)..........................................................................5

*Consol. Edison, Inc.* v. *Ne. Utils.*,
   318 F. Supp. 2d 181 (S.D.N.Y. 2004)........................................................32

*Crigger* v. *Fahnestock & Co.*,
   443 F.3d 230 (2d Cir. 2006)........................................................................24

*Dep't of Veterans Affairs* v. *Fed. Labor Relations Auth.*,
   33 F.3d 1391 (D.C. Cir. 1994)....................................................................22

*Devaney* v. *Chester*,
709 F. Supp. 1255 (S.D.N.Y. 1989)..................................................................................9

*Dexia Holdings, Inc.* v. *Countrywide Fin. Corp.*,
2012 WL 1798997 (C.D. Cal. Feb. 17, 2012)......................................................23

*Dexia SA/NV, et al.* v. *Deutsche Bank AG, et al.*,
Nos. 11 Civ. 5672, 11 Civ. 6141, 2013 WL 98063 (S.D.N.Y. Jan. 4, 2013) ................. passim

*Dexia SA/NV* v. *Deutsche Bank*,
No. 11 Civ. 05672 (JSR), Order (S.D.N.Y Feb. 6, 2012)...............................passim

*Emergent Capital Inv. Mgmt., LLC* v. *Stonepath Group, Inc.*,
343 F.3d 189 (2d Cir. 2003).............................................................................24

*Emps.' Ret. Sys. of Gov't of Virgin Islands* v. *Morgan Stanley & Co., Inc.*,
814 F. Supp. 2d 344 (S.D.N.Y. 2011)................................................................19

*Eurycleia Partners, LP* v. *Seward & Kissel, LLP*,
12 N.Y.3d 553 (2009)........................................................................................8

*Footbridge Ltd.* v. *Countrywide Home Loans, Inc.*,
2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010).................................................20

*Gabriel Capital, L.P.* v. *NatWest Fin., Inc.*,
177 F. Supp. 2d 169 (S.D.N.Y. 2001)..................................................................9

*Global Minerals & Metals Corp.* v. *Holme*,
35 A.D.3d 93 (1st Dep't 2006)..........................................................................24

*Global Network Commc'ns., Inc.* v. *City of New York*,
458 F.3d 150 (2d. Cir. 2006).............................................................................12

*Granite Partners, L.P.* v. *Bear, Stearns & Co.*,
58 F. Supp. 2d 228 (S.D.N.Y. 1999)..................................................................14

*Hamlet at Willow Creek Dev. Co.* v. *Ne. Land Dev. Corp*,
64 A.D.3d 85 (2d Dep't 2009)......................................................................33, 34

*HSH Nordbank AG* v. *UBS AG*,
95 A.D.3d 185 (1st Dep't 2012).........................................................................28

*Hunt* v. *Alliance N. Am. Gov't Income Trust, Inc.*,
159 F.3d 723 (2d Cir. 1998)..............................................................................16

*Hydro Investors, Inc.* v. *Trafalgar Power, Inc.*,
227 F.3d 8 (2d Cir. 2000)....................................................................................9

*Int'l Fund Mgmt. S.A.* v. *Citigroup Inc.*,
822 F. Supp. 2d 368 (S.D.N.Y. 2011)............................................................9

*Kalnit* v. *Eichler*,
264 F.3d 131 (2d Cir. 2001)............................................................28

*Landes* v. *Sullivan*,
235 A.D.2d 657 (3d Dep't 1997)............................................................23

*Landesbank Baden-Württemberg* v. *Goldman, Sachs & Co.*,
821 F. Supp. 2d 616 (S.D.N.Y. 2011)............................................................29

*Laub* v. *Faessel*,
297 A.D.2d 28 (1st Dep't 2002)............................................................8

*Lazard Freres & Co.* v. *Protective Life Ins. Co.*,
108 F.3d 1531 (2d Cir. 1997)............................................................24

*Lerner* v. *Fleet Bank, N.A.*,
459 F.3d 273 (2d Cir. 2006)............................................................8, 28

*In re Leslie Fay Cos., Inc. Sec. Litig.*,
918 F. Supp. 749 (S.D.N.Y. 1996)............................................................8

*Lia* v. *Saporito*,
2012 WL 5467529 (E.D.N.Y. Nov. 6, 2012)............................................................12

*In re Livent, Inc. Noteholders Sec. Litig.*,
151 F. Supp. 2d 371 (S.D.N.Y. 2001)............................................................31

*In re Merrill Lynch & Co., Inc.*,
273 F. Supp. 2d 351 (S.D.N.Y. 2003)............................................................5

*Munno* v. *Town of Orangetown*,
391 F. Supp. 2d 263 (S.D.N.Y. 2005)............................................................12

*Nat'l Granite Title Ins. Agency, Inc.* v. *Cadlerock Props. Joint Venture, Ltd.*,
5 A.D.3d 361 (2d Dep't 2004)............................................................34

*Plumbers' Union Local No. 12 Pension Fund* v. *Nomura Asset Acceptance Corp.*,
632 F.3d 762 (1st Cir. 2009)............................................................23

*Premier-New York, Inc.* v. *Travelers Prop. Cas. Corp.*,
867 N.Y.S.2d 20 (table), 2008 WL 2676800 (Sup. Ct. N.Y. Cnty. July 8, 2008)............17

*Rombach* v. *Chang*,
355 F.3d 164 (2d Cir. 2004)............................................................8

*Sec. Investor Prot. Corp.* v. *BDO Seidman, LLP*,
    222 F.3d 63 (2d Cir. 2000).....................................................................................13

*Small* v. *Lorillard Tobacco Co.*,
    252 A.D.2d 1 (1st Dep't 1998) ...........................................................................14

*Toho Bussan Kaisha, Ltd.* v. *Am. President Lines, Ltd.*,
    265 F.2d 418 (2d Cir. 1959)................................................................................31

*Tsereteli* v. *Residential Asset Securitization Trust 2006-A8*,
    692 F. Supp. 2d 387 (S.D.N.Y. 2010)................................................................20

*Turtur* v. *Rothschild Registry, Int'l, Inc.*,
    1993 WL 338205 (S.D.N.Y. Aug. 27, 1993) .......................................................9

*In re UBS Auction Rate Sec. Litig.*,
    2009 WL 860812 (S.D.N.Y. Mar. 30, 2009) .....................................................31

*VTech Holdings, Ltd.* v. *Pricewaterhouse Coopers, LLP*,
    348 F. Supp. 2d 255 (S.D.N.Y. 2004).................................................................9

*In re Wachovia Equity Sec. Litig.*,
    753 F. Supp. 2d 326 (S.D.N.Y. 2011).................................................................23

# TABLE OF ABBREVIATIONS

**Amended Complaints**:  The Amended Complaint filed by plaintiffs Dexia SA/NV, Dexia Credit Local SA, Dexia Holdings, Inc., and FSA Asset Management LLC; and the Amended Complaint filed by plaintiff Teachers Insurance and Annuity Association of America, on February 4, 2013.

**AC**:  Amended Complaint.

**Ace**:  Defendant Ace Securities Corp.

***Bear Stearns* Action**:  *Dexia SA/NV, et al.* v. *Bear, Stearns & Co., Inc., et al.*, 12 Civ. 04761 (JSR) (S.D.N.Y.).

**Certificates**:  The certificates for each individual investment that plaintiffs made in the Offerings.

**Clayton**:  Clayton Holdings, LLC.

**DB**:  Memorandum of Law in Support of Defendants' Motion to Dismiss, dated October 19, 2011.

**DBSI**:  Defendant Deutsche Bank Securities Inc.

**DBSP**:  Defendant Deutsche Bank Structured Products Inc.

**DB-ALT:** Defendant Deutsche Alt-A Securities Inc.

**DB Home**:  Deutsche Bank Home Lending LLC.

**DCL**:  Plaintiff Dexia Crédit Local SA.

**Decision**:  *Dexia SA/NV, et al.* v. *Deutsche Bank AG, et al.*, Nos. 11 Civ. 5672, 11 Civ. 6141, 2013 WL 98063 (S.D.N.Y. Jan. 4, 2013).

**Dexia Offerings**:  The 24 Offerings that are the subject of the Dexia plaintiffs' Amended Complaints.

***Dexia* v. *DB* Order**:  *Dexia SA/NV* v. *Deutsche Bank*, No. 11 Civ. 05672 (JSR), Order (S.D.N.Y Feb. 6, 2012).

**DHI**:  Plaintiff Dexia Holdings, Inc.

**DR**:  Reply Memorandum of Law in Further Support of Defendants' Motion to Dismiss, dated November 14, 2011.

**DTI**:  Debt-to-income ratio.

**FSA**:  Financial Security Assurance Holdings Ltd.

**FSAM**:  Plaintiff FSA Asset Management LLC.

**FWP**:  Free Writing Prospectus.

**Klunder Declaration:**  The Declaration of Michael Klunder in Support of Defendants' Motion to Dismiss, dated March 21, 2013.

**LTV**:  Loan to value ratio.

**MortgageIT**:  MortgageIT, Inc.

**Offerings**:  The 32 RMBS offerings that are the subject of the Amended Complaints.

**Offering Materials**:  Prospectuses, draft ProSupps, ProSupps, computational materials, term sheets, and FWPs relating to the Offerings.

**Original Complaints**:  The Corrected Complaint filed by plaintiffs Dexia SA/NV, Dexia Credit Local SA, Dexia Holdings, Inc., and FSA Asset Management LLC; and the Corrected Complaint filed by plaintiff Teachers Insurance and Annuity Association of America, both of which were dismissed by the Court on February 6, 2012.

**Originators**:  The mortgage originators identified in the Amended Complaints that allegedly originated the Underlying Loans.

**Preliminary Materials**:  Offering Materials other than the ProSupps.

**ProSupps**:  Prospectus Supplements.

**RMBS**:  Residential mortgage-backed securities.

**TIAA**:  Plaintiff Teachers Insurance and Annuity Association of America.

**TIAA Offerings**:  The eight offerings that are the subject of the TIAA Amended Complaint.

**Underlying Loans**:  The underlying loan collateral for the Offerings.

## PRELIMINARY STATEMENT

On January 4, 2013, this Court issued its Decision explaining the reasons for its February 6, 2012 bottom-line Order dismissing plaintiffs' Original Complaints for failure to plead fraud with the particularity required by Rule 9(b).  The Court dismissed plaintiffs' claims as to 11 of the 43 RMBS offerings with prejudice, but granted plaintiffs leave to replead their claims as to the remaining 32 Offerings.  The Court's Decision made clear that in order to survive a second motion to dismiss, plaintiffs must plead with particularity the elements of fraud for each of the remaining 32 Offerings, including identifying the alleged material misstatements that plaintiffs actually read and relied on in deciding to invest in the Offerings.

Despite two opportunities to meet their pleading burden, plaintiffs' Amended Complaints are replete with the same fundamental deficiencies as their Original Complaints. The Amended Complaints should be dismissed, with prejudice, for at least the following reasons:

*First*, volume is not a substitute for specificity.  The Amended Complaints have almost quadrupled in size to over 1,100 pages, but plaintiffs still have not alleged with particularity that they read and relied on any of the hundreds of alleged misstatements in the voluminous exhibits to their complaints.  Instead, plaintiffs make a general claim in a single sentence: "The statements that [plaintiffs] relied upon in connection with [their] purchases of the Deutsche Bank RMBS . . . are set forth in Exhibits B-G" of their Amended Complaints. Plaintiffs' Amended Complaints reveal, however, that hundreds of pages of Exhibits B-G are comprised of excerpts of Prospectus Supplements ("ProSupps,") which plaintiffs now admit were issued *after* they made the purchasing decisions for the vast majority of the Offerings, and therefore could not possibly have been relied upon by plaintiffs in making their purchasing decisions.  Not only are ProSupps the bulk of Exhibits B-G, but—as in the Original

Complaints—the only alleged misstatements specifically identified in the bodies of the Amended
Complaints are taken from ProSupps.

Plaintiffs' allegations concerning the ProSupps are even more striking in light of
developments in the Dexia action against Bear Stearns and other defendants, which is currently
before the Court.  Like the Amended Complaints here, the complaint in the *Bear Stearns* Action
contains the same style of exhibits purporting to show the misstatements upon which plaintiff
FSAM relied—mostly, as here, from ProSupps.  Yet, as defendants in that case demonstrated in
their summary judgment papers, such reliance has been flatly contradicted by deposition
testimony of Dexia's own investment managers—the same investment managers identified in
Dexia's initial disclosures in this action.  That testimony, which was given just **before** the Dexia
plaintiffs filed their Amended Complaint, demonstrates that they did not read or rely on a single
statement in any ProSupp in making decisions to purchase RMBS.[1]

Plaintiffs' only other reliance allegations are that they "typically" read "'term
sheets,' 'free writing prospectuses,' and other computational materials" before they would
"typically" place an RMBS order.  Such vague allegations attempt to mask plaintiffs' inability to
identify any specific documents they read and relied on and do not meet the particularity
requirements of Rule 9(b).  Plaintiffs' Amended Complaints should be dismissed because,
despite an additional year to obtain the information (if any exists) that they should have
identified before filing the Original Complaints, they have failed to plead which alleged
misstatements they relied on, and when, in connection with their purchases of each of the 32
Offerings.

---

[1]  The reliance allegations in TIAA's Amended Complaint are nearly identical to those in
Dexia's Amended Complaint; both generally allege reliance on Exhibits B-G, but do not
specifically allege reliance on ProSupps or any other Offering Materials.

*Second*, in further disregard of Rule 9(b), plaintiffs again employ a hodgepodge pleading style, lumping together the Offerings in an attempt to hide defects in their claims relating to particular Offerings.  In doing so, plaintiffs fail to address pleading issues that the Court explicitly noted in its Decision.  For example:

- *Offerings issued in 2007.*  The 32 Offerings that remain were issued at different times over a two-year period.  Relevant to the issue of justifiable reliance, most of the 2007-vintage Offerings contain extensive and explicit warnings about problems in the subprime market, of which plaintiffs' own contemporaneous statements show they were acutely aware.

- *Secondary market trades.*  The Dexia plaintiffs also cannot claim justifiable reliance as to two Offerings that FSAM acquired several months after issuance— in the summer of 2007—when publicly available performance reports showed a massive spike in delinquencies on the Underlying Loans.

- *Compliance with underwriting guidelines.*  Plaintiffs allege that defendants represented that the loans underlying the RMBS would conform with underwriting guidelines.  Yet for many of the 32 Offerings, the Offering Materials either do not contain such a representation or contain qualifying language that renders the representation entirely accurate.

*Third*, although plaintiffs vaguely allege that they relied on misstatements concerning credit ratings and computational data (such as FICO scores and LTVs) in the Offering Materials, they do not plead facts plausibly suggesting that any of the credit ratings or computational data were false.

*Fourth,* plaintiffs fail to allege that any reliance was justified.  Plaintiffs are highly sophisticated financial institutions with significant experience in the mortgage market, and had access to voluminous information about the risks associated with the Offerings and the Underlying Loans—including information contained in the Offering Materials.  Particularly with respect to their 2007 purchases, plaintiffs' own public statements about the mortgage market confirm that their knowledge of these risks was actual and not merely constructive.

Doc#: US1:8453110v1

*Finally*, the Dexia plaintiffs' Amended Complaint should be dismissed because they lack standing.  The Court's bottom-line Order granting defendants' first motion to dismiss stated that this action "need not have been dismissed on standing grounds ***at this stage*** of the litigation."  *Dexia* v. *DB* Order at 2 (emphasis added).  Although this action is still at the motion to dismiss stage, the Dexia plaintiffs included facts in their Amended Complaint that allow the issue of standing to be resolved now:  Namely, the Dexia plaintiffs have identified the agreement—the "Put Option Confirmation – Guaranteed Put Contract"—upon which the entire standing analysis turns.  *See* Dexia AC ¶ 22.  Based on the clear terms of that agreement, as well as the Dexia plaintiffs' admissions, the Court can find, as a matter of law, that none of the Dexia plaintiffs has standing to pursue their claims.

For these reasons, and for those that follow, the Amended Complaints should be dismissed with prejudice.

## STATEMENT OF FACTS AND ALLEGATIONS OF THE AMENDED COMPLAINTS[2]

### *The Parties*

Plaintiff Dexia is a major player in European financial and mortgage markets, both as an originator of residential loans and as a securitizer of RMBS.  Dexia has significant experience with U.S. RMBS through the activities of its subsidiary FSA—a leading provider of financial guaranty insurance on U.S. RMBS and other asset-backed securities—which it acquired in 2000 and sold in 2009.  Dexia 2006 Annual Report, at 86, 181 (Ex. 3); FSA 2006 10-K at 3 (Ex. 4).[3]  FSA developed extensive knowledge of mortgage originators through examinations,

---

[2]   Copies of the Amended Complaints are attached to the Klunder Declaration as Exhibits 1 and 2.  All subsequent citations in the form of "Ex.__" refer to exhibits to the Klunder Declaration.

[3]   In ruling on a motion to dismiss, the Court may refer to the full contents of documents referenced in the Complaints, as well as "legally required public disclosure documents filed

discussions, and site visits.[4]  In addition to insuring RMBS, FSA actively invested in RMBS

through plaintiff FSAM—which made the decisions to invest in each of the 24 Offerings at issue

in the Dexia Complaint, Dexia AC ¶ 20—and other units in FSA's financial products business.[5]

Dexia retained FSA's financial products business and FSAM following the sale of FSA.  Dexia

Press Release, July 1, 2009 (Ex. 5).

       Plaintiff TIAA and its subsidiaries are major institutional investors with extensive

experience in the financial and mortgage markets.  TIAA "operates one of the largest fixed-

income portfolios in the United States today," and is "one of the world's most highly regarded

institutional investors."[6]  The assets managed by TIAA and its subsidiaries—such as TIAA-

CREF Life Insurance Company and TIAA-CREF Trust Company—include substantial

investments in real estate and RMBS.  *E.g.*, 2008 TIAA-CREF Life Insurance Co. 2008 10-K at

---

with the SEC, and documents possessed by or known to the plaintiff and upon which it relied
in bringing the suit." *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir.
2007).  Additionally, the Court may consider "matters of which judicial notice may be
taken," such as newspaper articles, to demonstrate widespread discussion of a particular
topic.  *Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Brass* v.
*Am. Film Tech., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)); *In re Merrill Lynch & Co., Inc.*, 273
F. Supp. 2d 351, 382 n.3 (S.D.N.Y. 2003) ("The Court may take judicial notice of newspaper
articles for the fact of their publication . . . .").

[4]  FSA 2006 10-K, at 20 (Ex. 4) ("Reviews of transactions typically include an examination of
reports provided by, and (as circumstances warrant) discussions or site visits with, issuers,
obligors, originators, servicers, collateral managers, trustees and other transaction
participants.  Review of reports may include financial audits, servicer audits, evaluations by
third-party appraisers, engineers, consultants or reports by other experts retained by the
obligor or FSA.").

[5]  Ex. 4 at 3-11 (objectives and business of Financial Guaranty and Financial Products
Businesses); *id.* at 12-15 (insurance portfolio, including RMBS); *id.* at 30-36 (investment
portfolio, including RMBS).

[6]  How We Invest:  Fixed-Income Investing, TIAA, http://www1.tiaa-cref.org/public/about/
asset-management/fixed-income/index.html (last visited Mar. 18, 2013) (Ex. 6);  How We
Invest:  Time-Tested Investing Principles, TIAA, http://www1.tiaa-cref.org/public/about/
asset-management/facts/index.html (last visited Mar. 18, 2013) (Ex. 7).

23 (bond portfolio, including RMBS) (Ex. 8).  TIAA also engages in mortgage loan origination

through the activities of TIAA-CREF Trust Company.  Borrow, TIAA Direct, http://www1.tiaa-

cref.org/banking/borrow/index.html (last visited Mar. 18, 2013) (Ex. 9).

            Defendants DBSP, Ace, DB-ALT, and DBSI are legally independent entities that

play various roles related to RMBS.  As "sponsor" for the 24 Dexia Offerings and 8 TIAA

Offerings, DBSP acquired mortgage loans for securitization by purchasing them directly from

the Originators listed in the Amended Complaints.  *See* Dexia AC ¶ 33; TIAA AC ¶ 26.  Ace or

DB-ALT would then act as "depositor," purchasing the loans from the sponsor and placing them

in a trust in exchange for Certificates issued by the trust.  *See* Dexia AC ¶¶ 34, 36; TIAA AC ¶¶

27, 29.  DBSI underwrote the Certificates in all the Offerings, purchasing them from the

depositor and selling them to various investors.  *See* Dexia AC ¶ 26; TIAA AC ¶ 19.  Plaintiffs

contend that Deutsche Bank AG is the "ultimate parent" of DBSI, DBSP, and DB-ALT, and that

it "'direct[s] the management or policies' of DBSI in its public reports with the Financial

Industry Regulatory Authority."  Dexia AC ¶¶ 26, 78; TIAA AC ¶¶ 19, 71.

### *Background to the Amended Complaints*

            Dexia and TIAA filed the Original Complaints on July 13, 2011 and August 1,

2011, respectively, asserting causes of action relating to 43 separate RMBS offerings.

Defendants moved to dismiss on October 19, 2011, arguing, among other things, that plaintiffs

had failed to plead fraud with particularity.  On February 6, 2012, the Court issued a bottom-line

Order granting defendants' motion to dismiss in its entirety.  The Court explained that, "despite

their prolixity," the Original Complaints "fail[ed] to meet the particularity requirements of

Federal Rule of Civil Procedure 9(b) in certain key respects."  *Dexia* v. *DB* Order at 1.  The

Court dismissed the Original Complaints without prejudice as to the 32 Offerings sponsored by

DBSP, and with prejudice as to the 11 offerings not sponsored by DBSP.

Doc#: US1:8453110v1

On January 4, 2013, the Court issued its Decision explaining the reasons for its
bottom-line Order, highlighting numerous deficiencies in plaintiffs' pleadings, including that
plaintiffs had failed:  (i) for 16 offerings, to allege any misstatements; (ii) for the remaining 27
offerings, to plead with particularity the alleged misstatements and where they appear in the
Offering Materials; (iii) to allege the dates on which plaintiffs invested in the offerings; and (iv)
to state who is responsible for alleged misstatements in certain of the offerings.  *Dexia SA/NV, et
al.* v. *Deutsche Bank AG, et al.*, Nos. 11 Civ. 5672, 11 Civ. 6141, 2013 WL 98063, at *4-6
(S.D.N.Y. Jan. 4, 2013) ("Decision").  The Court also ruled that plaintiffs must allege with
particularity which statements they read and relied upon in making their investment decisions.
*See id*.  The Court held that it was insufficient to assert that plaintiffs had invested based on a list
of Offering Materials containing false statements without identifying the particular
misstatements in each of those materials.  *Id*. at *6.

### *Plaintiffs' Allegations in the Amended Complaints*

Plaintiffs filed the Amended Complaints on February 4, 2013.  Combined, the
Amended Complaints total 1,165 pages (280 pages of complaints, plus 885 pages of exhibits).
Volume notwithstanding, the Amended Complaints make the same fundamental allegations as
their predecessors, and they contain the same fundamental flaws.

Plaintiffs allege that over a two-year period between 2005 and 2007, in relation to
32 Offerings, defendants concealed defects in mortgage-loan collateral caused by the loose
origination standards of at least 22 different Originators.  Dexia AC ¶¶ 3, 40, 141-249; TIAA AC
¶¶ 3, 33, 133-98.  Plaintiffs allege that they purchased the Certificates in reliance on
misstatements set forth in the 883 pages of Exhibits B-G of the Amended Complaints
concerning: (i) loan origination and underwriting standards; (ii) the value of mortgage collateral,
including appraisals and LTVs, DTIs, credit scores, and owner occupancy rates; (iii) title

transfer; and (iv) RMBS credit ratings.  Although most of these alleged misstatements are drawn

from the ProSupps, others allegedly appear in draft ProSupps, prospectuses, computational

materials, term sheets, and free writing prospectuses.  Dexia AC ¶¶ 3, 81; TIAA AC ¶¶ 3, 73.

      The Amended Complaints assert claims under New York state law for fraud,

fraudulent inducement, aiding and abetting fraud, and negligent misrepresentation.

**ARGUMENT**

      In evaluating a Rule 12(b)(6) motion, a court accepts well-pleaded factual

allegations as true, but it need not accept conclusions unsupported by the facts alleged, legal

conclusions, bald assertions, or unwarranted inferences.  *See Bell Atl. Corp.* v. *Twombly*, 550

U.S. 544, 555 (2007).  Dismissal is appropriate where a plaintiff fails "'to raise a right to relief

above the speculative level.'"  *ATSI Commc'ns, Inc.*, 493 F.3d at 98 (quoting *Twombly*, 550 U.S.

at 555).

      Plaintiffs also must meet the heightened pleading requirements of Rule 9(b),

which apply to all of plaintiffs' claims.  *See In re Leslie Fay Cos., Inc. Sec. Litig.*, 918 F. Supp.

749, 766-67 (S.D.N.Y. 1996) (negligent misrepresentation); *Lerner* v. *Fleet Bank, N.A.*, 459 F.3d

273, 292-93 (2d Cir. 2006) (aiding and abetting fraud).  Under Rule 9(b), plaintiffs must:

"(1) specify the statements that the plaintiff[s] contend[] were fraudulent, (2) identify the

speaker, (3) state where and when the statements were made, and (4) explain why the statements

were fraudulent."  *Rombach* v. *Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (quotation omitted).

## I.     THE AMENDED COMPLAINTS FAIL TO PLEAD ACTUAL RELIANCE

      Under New York law, fraud requires a plaintiff to plead:  "a material

misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable

reliance by the plaintiff and damages," *Eurycleia Partners, LP* v. *Seward & Kissel, LLP*, 12

N.Y.3d 553, 559 (2009), along with direct and proximate causation.  *Laub* v. *Faessel*, 297

8

A.D.2d 28, 30-31 (1st Dep't 2002). Reliance is *actual* rather than presumed. *Int'l Fund Mgmt. S.A.* v. *Citigroup Inc.*, 822 F. Supp. 2d 368, 386-87 (S.D.N.Y. 2011) ("the requisite reliance is actual reliance, not the presumed reliance of a Section 10(b) action." (citing *Sec. Investor Prot. Corp.* v. *BDO Seidman, LLP*, 222 F.3d 63, 73 (2d Cir. 2000))); *see also Gabriel Capital, L.P.* v. *NatWest Fin., Inc.*, 177 F. Supp. 2d 169, 174 (S.D.N.Y. 2001).[7]

   The law is clear that to plead actual reliance on a material misstatement of fact as required by Rule 9(b), a plaintiff must plead with particularity that it "in fact read and relied on" those statements. *Turtur* v. *Rothschild Registry, Int'l, Inc.*, 1993 WL 338205, at *6 (S.D.N.Y. Aug. 27, 1993), *aff'd*, 26 F.3d 304 (2d Cir. 1994); *Devaney* v. *Chester*, 709 F. Supp. 1255, 1264 (S.D.N.Y. 1989) ("Here, reliance is alleged only in summary form in each of the Claims for Relief against Salomon without particularizing who, on behalf of CB & R, in fact read and relied on the statement in the Memorandum. This failure to specify the circumstances of reliance runs afoul of Rule 9(b)." (citations omitted)).

   A. **Plaintiffs Fail to Allege with Particularity that They Actually Read and Relied on Any False Statement for Any of the Offerings**

   In their first motion to dismiss, defendants argued that plaintiffs had failed to specifically allege that anyone actually read and relied on any alleged misstatement by defendants. Although the Original Complaints alleged that ProSupps for some of the Offerings contained misstatements, plaintiffs did not allege that they invested in the Offerings in reliance on those statements. At oral argument, the Court asked plaintiffs' counsel if he could allege what plaintiffs read and relied on with specificity. Plaintiffs' counsel admitted he could not:

---

[7] Actual reliance is also a necessary element of plaintiffs' negligent misrepresentation claims, *see Hydro Investors, Inc.* v. *Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000), fraudulent inducement, *see Centro Empresarial Cempresa S.A.* v. *Am. Movil S.A.B. de C.V.*, 17 N.Y.3d 269, 276 (2011), and aiding and abetting fraud claims. *See VTech Holdings, Ltd.* v. *Pricewaterhouse Coopers, LLP*, 348 F. Supp. 2d 255, 269 (S.D.N.Y. 2004).

Doc#: US1:8453110v1

THE COURT:  [I]f I were to give you leave to replead, could you do that?

MR. SILK: Yes, I mean, we've alleged it.  You might say it's not --

THE COURT:  The point is, do you have a basis at this point for saying that we know that so-and-so in our client's employ specifically relied on that particular statement with respect to that particular offering, or do you have just more general information?

MR. SILK: Standing here today right now, I wouldn't -- I would say to you we have more -- I have more general information, your Honor.

Oral Arg. Tr. at 57:3-14 (Nov. 23, 2011) (Ex. 10).

Plaintiffs have had more than a year to determine—for each of the 32 Offerings—whether they read and relied upon any specific alleged misstatement in making their investment decisions.  Yet that information is conspicuously absent from the Amended Complaints.  In 656 paragraphs of allegations there is not one allegation that plaintiffs actually read and relied on any specific alleged misstatement.  Instead, the two Amended Complaints contain a single identical sentence alleging general reliance on statements in hundreds of pages of exhibits:

> The statements that [FSAM/TIAA] relied upon in connection with its purchases of the Deutsche Bank RMBS, including the sources of those statements, the dates that those statements were made, and the page number of the source upon which each statement appears are set forth in Exhibits B-G of this Complaint.

Dexia AC ¶ 307; TIAA AC ¶ 255.

As an initial matter, the Court need not accept this allegation as true because it is belied by plaintiffs' own admissions in this and other actions.  Even a cursory examination of the 883 pages in Exhibits B-G reveals page after page of alleged misstatements in ProSupps.  Now that plaintiffs have pleaded the dates on which they invested in the Offerings—information that was missing from the Original Complaints—it is clear that for 28 of the 32 Offerings, plaintiffs invested *before* the ProSupps were even issued.  Plaintiffs therefore could not have relied on

Doc#: US1:8453110v1

alleged misstatements in those documents.[8]  In its Decision granting defendants' motion to dismiss, this Court held that plaintiffs' dates of purchase are "especially important . . . because it appears that plaintiffs' investments in twenty-eight of the forty-three Offerings occurred before the ProSupps were even issued."  Decision at *5.[9]

Plaintiffs' claimed reliance on hundreds of pages of alleged misstatements in ProSupps is quite surprising in light of recent testimony in the *Bear Stearns* Action by four Dexia witnesses—each of whom is identified as a relevant witness in the Dexia plaintiffs' initial Rule 26(a) disclosures in this action (Ex. 11)—which establishes that it was plaintiff FSAM's practice ***not*** to read ProSupps and other offering documents when purchasing RMBS:

- Jake Hendrickson, FSAM's former portfolio manager and 30(b)(6) representative, testified that FSAM investment personnel did not review ProSupps prior to purchasing new issue RMBS, and did not generally review these documents for secondary market purchases.[10]

---

[8]   *See* Dexia AC Ex. A (revealing that, for all Offerings except ACE 2007-HE4 A2A, ACE 2007-WM2 A2B, ACE 2007-WM2 A2C, and ACE 2007-ASAP1 A2C, plaintiffs invested ***before*** the ProSupps were filed); TIAA AC Ex. A (revealing that, for all of the TIAA Offerings, plaintiffs invested ***before*** the ProSupps were filed).

[9]   Plaintiffs allege that they were free to rescind any RMBS purchase up until the settlement date, which occurred after each of the ProSupps was issued.  Dexia AC ¶ 309; TIAA AC ¶ 256.  But plaintiffs nowhere allege that they read the ProSupps before the settlement date and decided not to rescind in reliance on the ProSupps.

[10]   FSAM 30(b)(6) Hendrickson Tr. 71:24-75:10 (Ex. 13) (Q: Okay. In the process of reviewing a new issue deal, what if any, role would reviewing the prospectus supplement or other offering documents play, if any, in your investment decision? A: It would -- they were not available. . . .  Q: So you didn't read or review the prospectus supplements, right? . . . A: Not prior to purchase.  Q: Okay. And the analysts who worked for you, Mr. Albus and the others, they didn't do it either prior to purchase, right?  A: Correct. . . .  Q: When FSAM evaluated secondary market purchase opportunities of RMBS, did you or anybody else review the prospectus supplements or other offering documents . . . [w]ith respect to anything. Did you read them?  A: In general, no.")

- Hongfei Zhang, the former head of risk management for FSA's Financial Products Group, testified that he *never* read a prospectus in connection with an RMBS purchase.[11]

- Russell Brewer, the former Chief Risk Officer at FSA, could not recall *any* instances in which he had read prospectuses or ProSupps.[12]

- Former FSAM Portfolio Manager Frank Albus testified that FSAM personnel generally read data files, not text statements, as part of their analysis. *See* Albus Tr. 48:17-49:3 (Ex. 12).

This testimony—taken shortly before plaintiffs filed their Amended Complaints in this action—are admissions of which the Court may take judicial notice and consider in analyzing the sufficiency of the Amended Complaints' allegations.[13]

Plaintiffs' only other reliance allegations are generalized and fail to meet their pleading burden.  Plaintiffs allege that they "typically" read certain types of materials, and they "typically" made their investment decisions after doing so.  Dexia AC ¶¶ 307-08; TIAA AC ¶¶ 255-56.  According to each of the Amended Complaints, these materials:

---

[11]   Zhang Tr. 69:23-70:22 (Ex. 14) (Q: "I just want to make sure, you've never read a prospectus in connection with the purchase of a residential mortgage-backed security?  A: No.").

[12]   Brewer Tr. 147:5-12 (Ex. 15) ("Q: Did you ever read prospectuses in connection with FSAFP's RMBS purchases in 2006 and 2007 that you recall?  A: I don't recall.  Q: Did you ever read prospectus supplements in connection with FSAFP's RMBS purchases in 2006 and 2007 that you recall?  A: I don't recall.").

[13]   The Court may take judicial notice of public records, including pleadings and testimony in other lawsuits.  *See Global Network Commc'ns, Inc.* v. *City of New York*, 458 F.3d 150, 157 (2d. Cir. 2006) (ruling that, on a motion to dismiss, a court may take judicial notice of "the fact of [other] litigation and related filings" (internal quotation marks omitted)); *see also Lia* v. *Saporito*, 2012 WL 5467529, at * 17-18 (E.D.N.Y. Nov. 6, 2012) (observing that the court "may properly take judicial notice of the fact that [plaintiff] made certain statements during his deposition in the administrative proceeding that are inconsistent with the factual allegations in [his] complaint"); *Munno* v. *Town of Orangetown*, 391 F. Supp. 2d 263, 268 (S.D.N.Y. 2005) ("[T]he court may take judicial notice of public records and of admissions in pleadings and other documents in the public record filed by a party in other judicial proceedings that contradict the party's factual assertions in a subsequent action." (internal quotation marks omitted).

12

> *typically* included "term sheets," "free writing prospectuses," and other
> computational materials[ ] concerning the credit characteristics of the
> mortgage loan pool (including, for example, borrower characteristics,
> collateral value, and owner-occupancy rates), the credit ratings, and the
> structure of the securitization . . . .

Dexia AC ¶ 307; TIAA AC ¶ 255 (emphasis added).  By using the word "typically" and not

being specific, plaintiffs admit that they did not *always* review the types of documents they cite

(and may not have done so with respect to the Offerings); and on the occasions that they did read

those documents, they did not *always* do so before investing (and may not have done so with

respect to the Offerings).  More significantly, plaintiffs nowhere allege that they even typically—

much less ever—read any of the particular misstatements that are cited in Exhibits B-G.

      In sum, plaintiffs' sparse and contradictory allegations of reliance do not come

close to meeting their heightened pleading burden.  Plaintiffs purport to have "relied" on 883

pages of statements concerning the Offerings, yet they conspicuously refrain from alleging that

they actually read any of those statements.  Plaintiffs contend that they "typically" read certain

types of materials.  But they carefully exclude from that list any reference to ProSupps—which

their own personnel have confirmed they did not read—despite the fact that the majority of

alleged misstatements were drawn from these very documents.  And they do not identify a single

specific statement they claim to have relied on in the materials they typically read.

      Although plaintiffs may wish it were otherwise, this is not a securities class action

with a fraud-on-the-market presumption of reliance.  Plaintiffs cannot meet their pleading burden

by simply cataloging all of the statements made by defendants that they claim are misleading and

say the market was misled.  Rule 9(b) requires more in an individual fraud action.  *See Sec.*

*Investor Prot. Corp.*, 222 F.3d at 73 ("[F]ederal courts repeatedly have refused to apply the fraud

on the market theory to state common law cases despite its wide acceptance in the federal

13

securities fraud context.  New York courts have also recognized this difference." (citations

omitted) (collecting federal and state cases)).

Plaintiffs' failure and inability to identify the specific misstatements that they read

and relied upon for each of the 32 Offerings mandates dismissal of their claims.  *See Granite*

*Partners, L.P.* v. *Bear, Stearns & Co.*, 58 F. Supp. 2d 228, 258 (S.D.N.Y. 1999) ("Despite the

[plaintiff's] catch-all allegation that [it] relied upon [the defendant's] statements . . . , the

[plaintiff] never ventures to actually plead facts that underlie this reliance.").[14]

**B.   Plaintiffs Otherwise Fail to Allege Any False Statements on which They Actually Relied**

Even if plaintiffs were allowed to plead reliance by reference to statements in

documents they "typically" read and relied upon without being specific, plaintiffs still have

failed to plead any actionable misstatements in the documents they typically read and might have

read with respect to the Offerings at issue.  Plaintiffs allege purported misstatements concerning

three main topics:  (i) compliance with underwriting guidelines; (ii) credit ratings; and (iii) loan-

level data (LTVs, owner occupancy status, DTIs, and credit scores).  Dexia AC ¶ 142; TIAA AC

¶ 134.  We address each in turn.

1.   Plaintiffs Fail to Allege Non-Conformity with Underwriting Guidelines

As an initial matter, the vast majority of alleged misstatements concerning

compliance with underwriting guidelines that are cited by plaintiffs are contained in ProSupps,

---

[14]   *See also Am. Fin. Int'l Group-Asia, L.L.C.* v. *Bennett*, 2007 WL 1732427, at *9-10 (S.D.N.Y. June 14, 2007) (fraud claim dismissed where "[t]he complaint conspicuously fails to allege that plaintiffs read the allegedly misleading registration statements, or even that they knew of their existence, instead making only two cursory allegations pertaining to reliance"); *Small* v. *Lorillard Tobacco Co.*, 252 A.D.2d 1, 15-16 (1st Dep't 1998) ("[T]he complaint presents no additional facts to support an inference that plaintiffs saw the [advertisement at issue] and relied on it.  The fact that the named plaintiffs 'read news periodicals during the time period the alleged misrepresentations were made . . . falls far short of proving [they] actually relied upon them.'"), *aff'd* 94 N.Y.2d 43 (1999).

Doc#: US1:8453110v1

which plaintiffs do not allege they even "typically" read, and which they admit now were issued after their purchasing decisions in all but four instances.  Although plaintiffs contend that the materials they typically reviewed—term sheets, FWPs, and "computational materials"—are "virtually identical" to the "final" ProSupps, Dexia AC ¶ 309; TIAA AC ¶ 257, the documents reveal otherwise.[15]

   For four of the 32 Offerings—DBALT 2006-AR6,  DBALT 2006-AR4, DBALT 2006-AR3, and ACE 2007-HE3—neither the Preliminary Materials nor the ProSupps represent that *any* of the Underlying Loans conformed to the underwriting guidelines of any Originator. *See* Dexia AC Ex. B at 13-19, 36-60, 131-41.

   For eight additional Offerings—DBALT 2007-AR2, ACE 2007-HE2, ACE 2006-HE1, ACE 2006-HE2, ACE 2006-HE3, ACE 2007-HE4, ACE 2006-SL3, and DBALT 2006-AB2—the Preliminary Materials make underwriting compliance-related representations about Underlying Loans from only *some* of the Originators.[16]  Without further information concerning

---

[15] In its Decision dismissing the Original Complaints, the Court held it improper to make this kind of gross generalization given the material differences among relevant Offering documents.  Decision at *5 & n.9.

[16] The Preliminary Materials for DBALT 2007-AR2 make representations about American Home Mortgage, but none about MortgageIT.  *See* Dexia AC Ex. B at 7-12.  The Preliminary Materials for ACE 2007-HE2 make representations about People's Choice, but none about CIT or First NLC.  *See* Dexia AC Ex. B at 149-57.  The Preliminary Materials for ACE 2006-HE1 make representations about Fremont, but none about OwnIt.  *See* Dexia AC Ex. B at 221-24.  The Preliminary Materials for ACE 2006-HE2 make representations about Argent, but none about CIT or Chapel Mortgage.  *See* Dexia AC Ex. B at 214-17.  The Preliminary Materials for ACE 2006-HE3 make representations about Encore, but none about Aegis or First NLC.  *See* Dexia AC Ex. B at 206-11.  The Preliminary Materials for ACE 2007-HE4 make representations about DB Home, but none about ResMae.  *See* Dexia AC Ex. B at 123-30.  The Preliminary Materials for ACE 2006-SL3 make representations about American Home, but none about Chapel.  *See* TIAA AC Ex. B at 31-33.  The Preliminary Materials for DBALT 2006-AB2 make representations about American Home, but none about GreenPoint.  *See* TIAA AC Ex. B at 13-17.

Doc#: US1:8453110v1

the proportion of the loans that came from each Originator, plaintiffs have not established for

these Offerings that the alleged misstatements were material.[17]

   For five additional Offerings—ACE 2006-FM1, ACE 2006-NC2, ACE 2007-

WM1, ACE 2007-WM2, and ACE 2006-SL2—the Preliminary Materials contain express

qualifications that render statements about compliance true and not misleading.  In each case, the

Preliminary Materials cautioned that there would be a "substantial" or "significant" number of

loans falling outside the guidelines, and in all but one of these cases (ACE 2006-NC2) the

Preliminary Materials further represented that the loans would only "generally" conform to

guidelines.[18]  In light of the contextual language supplied by these documents, the statements

regarding compliance with underwriting guidelines are not sufficiently pled to be untrue or

misleading.  *Hunt* v. *Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 728-29 (2d Cir.

1998) ("The prospectus must be read as a whole . . . .  [T]he central issue . . . is not whether the

particular statements, taken separately, were literally true, but whether defendants'

representations, taken together and in context, would have mis[led] a reasonable investor about

the nature of the [securities]." (internal quotation marks omitted)).

   Finally, for seven of the remaining Offerings—DBALT 2005-AR1, ACE 2006-

ASAP1, DBALT 2006-AR5, DBALT 2006-AB1, ACE 2006-SL1, DBALT 2006-AF1, and ACE

---

[17] For example, People's Choice is the only Originator for which the Dexia plaintiffs cite a compliance-related statement in the Preliminary Materials of ACE 2007-HE2.  *See* Dexia AC Ex. B at 154.  Yet People's Choice contributed only approximately 25% of the Underlying Loans for that Offering.  ProSupp, ACE 2007-HE2, at S-60 (Ex. 16).

[18] *See* FWP, ACE 2006-FM1, at 68-69 (Ex. 17); FWP, ACE 2006-NC2, at 64 (Ex. 18); FWP, ACE 2007-WM1, at 58 (Ex. 19); FWP, ACE 2007-WM2, at 62 (Ex. 20); FWP, ACE 2006-SL2, at 41 (Ex. 21) (statement made as to Freemont but not as to Long Beach).  Preliminary Materials for two other Offerings also contain these disclosures.  *See* FWP, ACE 2006-HE1, at S-72 (Ex. 22); FWP, ACE 2006-HE2, at 68 (Ex. 23) (statement made as to Argent, but not as to Chapel or CIT).

Doc#: US1:8453110v1

2005-SL1—plaintiffs claim they relied on statements regarding underwriting compliance in form prospectuses attached to registration statements issued many months, even years, before their purchases.[19]  For example, the Dexia plaintiffs claim they relied on a January 27, 2004 form ProSupp when they invested in DBALT 2005-AR1 over a year and a half later, on July 15, 2005.[20]  Plaintiffs' reliance on these form documents—which they never allege they even "typically" read—is implausible and unreasonable given the availability of updated Offering Materials prior to plaintiffs' purchases.  *See Premier-New York, Inc.* v. *Travelers Prop. Cas. Corp.*, 867 N.Y.S.2d 20 (table), 2008 WL 2676800, at *7 (Sup. Ct. N.Y. Cnty. July 8, 2008) (holding reliance on stale representations unreasonable as a matter of law).

As discussed above, although allegations concerning compliance with underwriting guidelines are the centerpiece of plaintiffs' Amended Complaints, plaintiffs have failed to allege with specificity that anyone read and relied on ***any*** of the misstatements alleged in the Amended Complaints or the Exhibits.  Plaintiffs compound this clear pleading deficiency by treating all of the 32 Offerings as if they were identical when, as shown above, there exist numerous material differences among the Offerings.

2.  <u>Plaintiffs Cannot Establish that the Credit Ratings Were Fraudulent</u>

Plaintiffs also contend that the credit ratings for the Offerings were false.  They allege both that defendants (i) ***deceived*** the rating agencies by providing inaccurate information about the Offerings and Underlying Loans, and (ii) pressured the rating agencies to assign ratings

---

[19]   Dexia AC Ex. B at 34 (DBALT 2006-AR5), 63 (DBALT 2006-AF1), 73-74 (DBALT 2005-AR1), 255 (ACE 2006-ASAP1); TIAA AC Ex. B at 22 (DBALT 2006-AB1), 67 (ACE 2005-SL1), 76 (ACE 2006-SL1).

[20]   *See* Dexia AC Ex. A & Ex. B at 73-75.  The form ProSupps contain blanks for the information that plaintiffs allege they "typically" read.  *See generally* Deutsche Alt-A Securities Inc., Form S-3/A (Reg. 333-199675) filed 01/27/04 (Ex. 24).

Doc#: US1:8453110v1

the agencies *knew* to be false.  Dexia AC ¶¶ 283-302; TIAA AC ¶¶ 232-51.  Beyond the inconsistency of these arguments, which underscores the tenuousness of plaintiffs' claims, both arguments independently fail.

Plaintiffs allege that defendants deceived the rating agencies by providing them with information that overstated borrowers' ability and willingness to pay their mortgages and the value of that collateral, and by providing the rating agencies with "the results of [defendants'] due diligence of the mortgage pools" but failing to disclose how that due diligence was performed and what was done with its results.  Dexia AC ¶ 287; TIAA AC ¶ 236.  Plaintiffs have failed, however, to allege any specific facts concerning the "information" that allegedly was provided to the rating agencies, nor do they allege in anything other than conclusory terms that this vaguely described "information" would have made any difference to the rating agencies. Dexia AC ¶¶ 287-88; TIAA AC ¶¶ 236-37; *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 771-72 (S.D.N.Y. 2012) (dismissing claims based on credit ratings where plaintiffs did not allege the information relied on by the rating agencies in arriving at the ratings).

Plaintiffs likewise make no factual allegations supporting their conclusion that the rating agencies assigned false ratings as a result of pressure from any defendant.  Their theory rests primarily on reports and testimony concerning general conflicts of interest and practices within the industry.  Only three of those allegations are tied to any defendant, and none of them is sufficient to support an actionable misstatement:

First, plaintiffs allege that Deutsche Bank and seven other banks were subpoenaed by the New York Attorney General "'to see whether they misled credit-rating services.'"  Dexia AC ¶ 298; TIAA AC ¶ 247.  Yet plaintiffs do not allege any adverse finding against Deutsche

18

Bank in connection with that inquiry, and this Court has previously held that plaintiffs may not proceed on "unproven allegations from other complaints."  Decision at *6 n.10.

Next, plaintiffs rely on a March 2007 email from a Moody's analyst noting that "[Deutsche Bank] pushing back dearly saying that the deal has been marketed already and that we came back 'too late' with this discovery. . . .  She claims it's hard for them to change the structure at this point."  Dexia AC ¶ 302; TIAA AC ¶ 251.  However, the Amended Complaints fail to allege any facts connecting the exchanges discussed in the email to any of the Offerings, or even to support an inference that Deutsche Bank improperly pressured Moody's to inflate ratings, much less that Moody's acceded to any pressure.

Finally, plaintiffs cite an email in which DBSI employee Greg Lippmann (who is not alleged to have been involved in structuring any RMBS let alone any of the Offerings at issue) allegedly advised a trader at Mast Capital that "the June 06 deals have a taint that earlier months don[']t due to the theory that June deals were crammed with bad stuff in order to beat the S&P [model] revisions."  Dexia AC ¶ 302; TIAA AC ¶ 251.  Yet plaintiffs do not allege that the referenced securities were underwritten by Deutsche Bank, and the email itself shows that they were in fact issued by Long Beach Mortgage Trust.  Email from Greg Lippmann to Craig Carlozzi (Oct. 20, 2006) (Ex. 25).

Ultimately, given plaintiffs' failure to specifically allege that defendants both deceived and pressured the ratings agencies, plaintiffs have failed to plead actionable misstatements concerning credit ratings, which represent the subjective opinions of the rating agencies.  *See Emps.' Ret. Sys. of Gov't of Virgin Islands* v. *Morgan Stanley & Co., Inc.*, 814 F. Supp. 2d 344, 352 (S.D.N.Y. 2011) ("Absent allegations specific to the [security], Plaintiff fails to plead sufficient factual content from which the Court can draw any reasonable inference

19

regarding [defendant's] alleged involvement (with the rating agencies) generating the Triple–A ratings at issue."); *Tsereteli* v. *Residential Asset Securitization Trust 2006-A8*, 692 F. Supp. 2d 387, 393-94 (S.D.N.Y. 2010).

        3.      The Allegations of False Computational Data Also Fail

        Plaintiffs similarly fail to carry their pleading burden with respect to the falsity of the loan data in the "computational materials," which they claim "typically" to have reviewed prior to investing in RMBS.  For the reasons discussed below, the Amended Complaints do not allege facts sufficient to establish any misrepresentation with respect to owner occupancy rates, DTIs, LTVs, or any other computational data.

        First, plaintiffs' allegations of falsity relating to owner-occupancy data are entirely insufficient.  Following the dismissal of the Original Complaints, plaintiffs hired a consultant to perform a "loan-level analysis" that purports to show that the owner occupancy data reported in the "computational materials" was inaccurate.  *See* Dexia AC ¶¶ 259-66; TIAA AC ¶¶ 208-15.  But even if plaintiffs' backward-looking analysis were sufficient to support the allegation that the reported data was inaccurate, it nevertheless fails to establish any misstatement by defendants because ProSupps for ***every*** Offering expressly state that this data was entirely based on borrowers' own representations as to their intent to occupy the subject properties.  *See, e.g.*, ProSupp, ACE 2006-ASAP1 at S-32 (Ex. 26) ("The occupancy status of a Mortgaged Property is as represented by the mortgagor in its loan application.").  Absent some allegation that the borrowers' representations were inaccurately reported in the materials on which plaintiffs relied—and plaintiffs make none—the analysis fails to carry plaintiffs' pleading burden.  *See Footbridge Ltd.* v. *Countrywide Home Loans, Inc.*, 2010 WL 3790810, at *9 (S.D.N.Y. Sept. 28, 2010) (dismissing fraud claims based on misrepresentations of borrower occupancy rates because "[t]he statements in the Detailed Reports include additional limiting

language that explains that the percentages reported are '[b]ased upon representations of the related borrowers at the time of origination'").

Second, plaintiffs' allegations concerning the falsity of DTIs and FICO scores are also without support. *See* Dexia AC ¶¶ 88-93; TIAA AC ¶¶ 80-85. Plaintiffs allege no facts at all that support an inference that reported FICO scores were false.[21] And with respect to DTIs, plaintiffs allege that values associated with underlying adjustable rate mortgages were artificially low because they were calculated using initial "teaser" rates rather than fully indexed rates. Dexia AC ¶ 49; TIAA AC ¶ 84. Yet ProSupps for *every* Offering explicitly disclosed that the loans would be originated based on the borrower's ability to repay the initial interest rate, and that this rate was subject to increases after the initial period.[22]

Third, plaintiffs allege that the appraisal values used for LTVs reported in the computational materials were inflated. *See* Dexia AC ¶¶ 251-58; TIAA AC ¶¶ 200-07. Plaintiffs purport to compare the extent to which the data in the computational materials and plaintiffs' own retrospective loan-level analysis disagree about the proportion of Underlying Loans with LTV ratios below 80% and above 100%. *See* Dexia AC ¶¶ 257-58; TIAA AC ¶¶ 206-07. There are numerous reasons why plaintiffs' purported analysis does not support an inference that

---

[21] Plaintiffs' sole specific allegation of misstated FICO scores concerns a *Miami Herald* article reporting that employees for one originator, Argent, "taught brokers how to doctor credit reports." Dexia AC ¶ 234. This single allegation, which is unconnected to any of the Offerings, does not establish a plausible inference that the FICO scores in the thousands of Underlying Loans were manipulated by the Originators.

[22] *See, e.g.*, ProSupp, ACE 2006-NC2, at S-32 (Ex. 27) ("Under the applicable underwriting standards, the borrower under each mortgage loan or contract generally will be qualified on the basis of the mortgage rate or contract rate in effect at origination. The repayment of any of these mortgage loans or contracts may therefore be dependent on the ability of the borrower to make larger level monthly payments following the adjustment of the mortgage rate or contract rate."). The same disclosure appears in the Preliminary Materials cited by plaintiffs. *See, e.g.*, Prospectus, ACE 2007-ASAP2, at 28 (Ex. 28) (same).

defendants misstated LTVs.  For instance, while plaintiffs allege that the retroactive automated

valuation model ("AVM") on which their analysis is based generally produces "independent,

statistically derived valuation estimates," Dexia AC ¶ 254; TIAA AC ¶ 203, plaintiffs do not

claim that their analysis generated statistically significant results here.  Nor do plaintiffs allege

that the sample of Underlying Loans they used to perform their so-called analysis was randomly

selected.  *See* Dexia AC ¶ 250; TIAA AC ¶ 199.

        Plaintiffs also do not allege either (a) the amount of the disparity between the

appraisal values reported by defendants ("reported values") and plaintiffs' AVM values

("modeled values"), or (b) the margins of error that apply to the reported and modeled values,

which could be substantial.  To begin with, the ProSupp for every Offering explicitly states that

LTVs and other loan characteristics are subject to specific stated variances.  For five Offerings,

the stated variance is 10%,[23] and for the remaining Offerings the stated variance is 5%.[24]  There

also are two separate variances that apply to the values derived by plaintiffs' sampling analysis.

The first arises from the selection of plaintiffs' Underlying Loan sample.  *See Dep't of Veterans*

*Affairs* v. *Fed. Labor Relations Auth.*, 33 F.3d 1391, 1394 (D.C. Cir. 1994) ("Any sampling

---

[23]   *E.g.*, ProSupp, DBALT 2006-AR3, at 24-25 (Ex. 29) ("All dollar amounts, percentages and other numerical information relating to the Mortgage Loans described herein are subject to a permitted variance of plus or minus 10%.").  Four other Offerings contain a stated 10% variance.  *See* ProSupp, DBALT 2006-AF1, at 21 (Ex. 51); ProSupp, DBALT 2006-AB1, at S-19 (Ex. 30); ProSupp, DBALT 2006-AB2, at 19 (Ex. 31); and ProSupp, DBALT 2006-AB4, at 24 (Ex. 32).

[24]   *E.g.*, ProSupp, ACE 2006-ASAP 1, at S-22 (Ex. 26) ("The pool of mortgage loans (the 'Mortgage Pool') will consist of [mortgage loans] having an aggregate principal balance as of the Cut-off Date of approximately $493,170,821 after application of scheduled payments due on or before the Cut-off Date whether or not received, and subject to a permitted variance of plus or minus 5%."; "If, as of the Closing Date, any material pool characteristic differs by 5% or more from the description in this prospectus supplement, revised disclosure will be provided either in a supplement or in a Current Report on Form 8-K).  Other Offerings with a stated 5% variance include all of the 22 Ace Offerings, DBALT 2005-AR1, DBALT 2006-AR4, DBALT 2006-AR5, DBALT 2006-AR6, and DBALT 2007-AR2.

22

involves a margin of error.").  The second is associated with the AVM that plaintiffs applied to

that sample.[25]  Plaintiffs do not disclose these margins of error or the relevant discrepancies, or

make any other allegation sufficient to support a plausible inference that LTVs were materially

inflated.  Just as allegations based on information obtained from a confidential witness must have

some indicia of reliability, *see In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 352

(S.D.N.Y. 2011), a purported statistical study used to support a falsity allegation must have some

indicia of plausibility.  If plaintiffs can plead fraud based on allegations concerning opaque

statistical "findings," "virtually *every* investor in mortgage-backed securities could subject a

multiplicity of defendants to the most unrestrained of fishing expeditions."  *Plumbers' Union*

*Local No. 12 Pension Fund* v. *Nomura Asset Acceptance Corp.*, 632 F.3d 762, 774 (1st Cir.

2009) (internal quotation marks omitted) (rejecting claim that defendant exerted undue pressure

on appraisers based on non-specific allegations of bank practices in general).[26]

---

[25]  Because "[t]hese model estimates are subject to error, . . . AVM providers also produce
performance metrics called confidence scores, which assess the accuracy and quantify the
AVM provider's confidence in those estimates of value." CoreLogic, *Forecast Standard
Deviation & AVM Confidence Scores*, *available at* http://www.corelogic.com/product-
media/asset_upload_file 939_15228.pdf (Ex. 33).  *See also* "Retrospective AVMs—How Do
They Work & How Accurate Are They?" at 2 (white paper, Aug. 2010), *available at*
http://www.corelogic.com/product-media/asset_upload_file157_15227.pdf (Ex. 34) (15%
margin of error); "Housing Statistics Hit Rough Waters," *The Wall Street Journal* (January
2011) (Ex. 35) (stating that AVM estimates are within 10% of a sales price for about 55% to
75% of homes).

[26]  Plaintiffs also allege that the Offering Materials misstated that DBSP, as Sponsor, "will
represent and warrant as of the Closing Date" that it has transferred title and other rights to
the trust.  Dexia AC ¶ 273; TIAA AC ¶ 222.  In order for such statements concerning future
actions, promises, or expectations to be actionable, plaintiffs must allege a present intent to
deceive.  *See, e.g.*, *627 Acquisition Co.* v. *627 Greenwich, LLC*, 85 A.D.3d 645, 647 (1st
Dep't 2011); *Landes* v. *Sullivan*, 235 A.D.2d 657, 659-60 (3d Dep't 1997).  They have failed
to do so here.  The mere allegation that "Deutsche Bank stated in the Offering Materials that
the issuing trusts possessed good title to the mortgage loans," Dexia AC ¶ 273, TIAA AC
¶ 222, does not meet the particularity requirements of Rule 9(b).  *See Dexia Holdings, Inc*. v.
*Countrywide Fin. Corp*., 2012 WL 1798997, at *5 (C.D. Cal. Feb. 17, 2012) (allegation that

## II.     PLAINTIFFS FAIL TO PLEAD JUSTIFIABLE RELIANCE

Even if plaintiffs could show that they actually read and relied on some alleged misstatement or omission by defendants, dismissal still would be appropriate because plaintiffs cannot establish that any reliance was justified.  *See Lazard Freres & Co.* v. *Protective Life Ins. Co.*, 108 F.3d 1531, 1541 (2d Cir. 1997) ("Under New York law, in order to sustain a claim of fraud, a party must establish, *inter alia*, justifiable reliance.").

"New York law imposes an affirmative duty on sophisticated investors to protect themselves from misrepresentations made during business acquisitions by investigating the details of the transactions and the business they are acquiring." *Global Minerals & Metals Corp.* v. *Holme*, 35 A.D.3d 93, 100 (1st Dep't 2006).  "[T]he greater the sophistication of the investor, the more inquiry that is required."  *Crigger* v. *Fahnestock & Co.*, 443 F.3d 230, 235 (2d Cir. 2006).  To the extent that due diligence should have put the investor "on notice of the existence of material facts which have not been documented and [it] nevertheless proceeds with a transaction without securing the available documentation . . . [it] may truly be said to have willingly assumed the business risk that the facts may not be as represented." *Emergent Capital Inv. Mgmt., LLC* v. *Stonepath Group, Inc.*, 343 F.3d 189, 195 (2d Cir. 2003) (quoting *Rodas* v. *Manitaras*, 159 A.D.2d 341, 343 (1st Dep't 1990)).

### A.     Plaintiffs Are Highly Sophisticated Investors and Had Access to Voluminous Information About the Allegedly Undisclosed Risks

Plaintiffs cannot dispute that they are highly sophisticated institutional investors. *See supra* pp. 3-6.  In light of their sophistication, plaintiffs were fully capable of analyzing the risks associated with the Offerings.  Indeed, plaintiffs' own public disclosures show they were

---

"'the Offering Documents . . . represented in substance that the issuing trust for that offering had obtained good title to the mortgage loans comprising the pool for the offering' . . . fails to identify any statement with sufficient particularity under Rule 9(b).").

Doc#: US1:8453110v1

aware of the risks about which they now complain.  On March 27, 2007—prior to purchasing

Certificates in five of the Offerings[27]—Dexia issued a press release and analyst presentation,

stating that:

- "FSA and Dexia have **long expected** problematic developments to arise in the ABS sphere, and more particularly in the sub-prime segment."  Dexia, Sub-Prime US Residential Mortgages: Analysis and Overview of Dexia Group's Exposure, 16 (March 27, 2007), *available at* http://www.dexia.com/EN/journalist/press _releases/Documents/20070327_fsa.pdf  (Ex. 36) (emphasis added).

- "Over the past few months the press has been reporting that 2006 vintage sub-prime mortgage loans have been **performing poorly**. Symptoms include: rising delinquencies and early payment defaults . . . ."  *Id.* at 5 (emphasis added).

- "Both at Dexia and FSA, we are satisfied to 'have kept our powder dry' in anticipation that **weak underwriting and aggressive growth** would ultimately lead to a market crisis."  *Id.* at 17 (emphasis added).

Public statements by TIAA reflect that it was also aware of these risks.  As early as April 2006—

before TIAA purchased four of the Offerings[28]—TIAA-CREF's Managing Director and Chief

Investment Economist stated that  "housing is now poised to detract from growth as home prices

are stalling or even declining," noting that "[i]f the housing market became extremely distressed,

with prices falling sharply, banks, mortgage lenders, and mortgage insurers might experience

large losses that could lead to further economic distress."[29]

As the Court observed in its Decision, some of the Offering Materials also

contained extensive warnings about these risks.  For example, as the housing market deteriorated

---

[27]  These Offerings, and associated investment dates, are: ACE 2007-ASAP2 A2C (5/21/07), ACE 2007-HE4 A2A (7/30/07), ACE 2007-HE4 A2C (4/26/07), ACE 2007-HE5 A2C (6/19/07), and ACE 2007-WM2 A2C (3/29/07).  *See* Dexia AC Ex. A.

[28]  These Offerings, and associated investment dates, are: ACE 2006-SL3 (6/21/06), ACE 2006-SL4 (8/11/06), DBALT 2006-AB2 (5/15/06), and DBALT 2006-AB4 (9/27/06).  *See* TIAA AC Ex. A.

[29]  Leo Kamp, *Kamp's Comments –Will The Housing Boom Become a Bust, Pushing the U.S. Into Recession?* (April 3, 2006), *available at* http://web.archive.org/web/20060923200118/ http://www.tiaa-cref.org/support/news/articles/gen0604_068.html (Ex. 37).

in 2007, the ProSupps and Preliminary Materials contained additional warnings. *See* Decision at *5 (quoting the disclaimer in a 2007 ProSupp and noting that the ProSupps are not "boilerplate"; they contain "material differences"). ProSupps for eight of the later-vintage Offerings explicitly warned that "[d]elinquencies and losses with respect to residential mortgage loans generally have increased in recent months, and may continue to increase" and that "numerous mortgage originators have recently experienced difficulties" resulting from factors including "fraud claims."[30] The ProSupps and Preliminary Materials explicitly warn that the Offerings should be considered only by investors with the "expertise" to analyze the "market risk" associated with any contemplated investment,[31] and that certain types of Underlying Loans—including interest-only loans, balloon loans, and loans secured by non-owner occupied properties—presented increased risks.[32] Consistent with their hodgepodge pleading style—despite the Court's statement about the material differences among the ProSupps—plaintiffs do not take account of these differences in their Amended Complaints.[33]

Plaintiff FSAM, the Dexia entity that invested in the Offerings, in fact had complete visibility into the declining performance of the Underlying Loans for ACE 2007-WM2

---

[30]   *See* ProSupp, ACE 2007-ASAP1, at S-22 (Ex. 38); ProSupp, ACE 2007-ASAP2, at S-23 (Ex. 39); ProSupp, ACE 2007-HE2, at S-22 (Ex. 40); ProSupp, ACE 2007-HE3, at S-22 (Ex. 41); ProSupp, ACE 2007-HE4, at S-23 (Ex. 42); ProSupp, ACE 2007-HE-5, at S-22 (Ex. 43); ProSupp, ACE 2007-WM2, at S-22 (Ex. 44); ProSupp, DBALT 2007-AR2, at 28 (Ex. 45).

[31]   *E.g.*, ProSupp, ACE 2006-ASAP1, at S-21 (Ex. 26) (emphasis added); *see also* FWP, ACE 2006-ASAP6, at 22 (Ex. 46) (same).

[32]   *E.g.*, ProSupp, ACE 2006-ASAP1, at S-11, S-13, S-22 (Ex. 26); *see also* FWP, ACE 2006-ASAP6, at 13 (Ex. 46) (same).

[33]   Further, plaintiffs had access to information to identify and assess the risks about which they now complain, which included: (a) loan tapes containing granular information about the Underlying Loans, (b) publicly available reports concerning the performance of the Underlying Loans and similar mortgage collateral, and (c) media and analyst reports containing extensive information about difficulties experienced by Originators and the deterioration in the credit quality and performance of subprime collateral. *See* DB at 11-14.

26

and ACE 2007-HE4, which it acquired in the secondary market three months after each Offering closed. Between the closing and purchase dates for these Offerings, publicly available performance reports disclosed that underlying loan delinquencies had jumped by 363% and 194%, respectively.[34] Not only was FSAM on notice of such negative performance, but its investment personnel testified in the *Bear Stearns* Action that they actually reviewed this type of information as part of their general practice.[35]

### B.    Based on the Available Information, Plaintiffs' Reliance Was Not Justified

Given their sophistication and the information that was available to them at the time, plaintiffs cannot plead justifiable reliance on any of the misstatements they now allege.

Plaintiffs cannot establish that they justifiably relied on statements concerning compliance with underwriting guidelines. Especially when combined with statements in the Offering Materials that there would be "significant" and "substantial" exceptions and the Underlying Loans would only "generally" conform to guidelines, the information available to plaintiffs put them on notice of the possibility of pervasive non-compliance.

---

[34]   *Compare* ACE 2007-WM2 Remittance Report, dated April 25, 2007 (showing 114 delinquent loans reflecting $26.4 million of the total loan pool balance), *with* ACE 2007-WM2 Remittance Report, dated June 25, 2007 (showing 414 delinquent loans reflecting $86.4 million of the total loan pool balance) (Ex. 47). *Compare* ACE 2007-HE4 Remittance Report, dated May 25, 2007 (showing 221 delinquent loans reflecting $49.2 million of the total loan pool balance), *with* ACE 2007-HE4 Remittance Report, dated July 25, 2007 (showing 428 delinquent loans reflecting $96.9 million of the total loan pool balance) (Ex. 48).

[35]   *See* FSAM 30(b)(6) Hendrickson Tr. 74:5-8 (Ex. 13) ("Q: Okay. You would review the specific data about the collateral and how it has performed since issue, right?  A: Correct."); *Id.* at 21:19-22:6 ("Q. So for a secondary deal, is it fair to say that Bloomberg and Intex would have all sorts of analytical tools to evaluate the performance of those particular bonds over time up until the time when you are considering buying them; is that right? . . . A. They were logical places to go to do the analysis, correct.")

Doc#: US1:8453110v1

Plaintiffs also cannot justify their blind reliance on the ratings assigned to the Offerings.  As sophisticated investors, they were obligated to independently assess the reliability of those ratings, by comparing the market's valuation of those securities in relation to its valuation of similarly rated non-RMBS securities.  *See HSH Nordbank AG* v. *UBS AG*, 95 A.D.3d 185, 196 (1st Dep't 2012) ("Far from being peculiarly within [defendant's] knowledge, the reliability of the credit ratings could be tested against the public market's valuation of rated securities . . . [and] would have revealed that the credit rating conferred on a security by a rating agency did not necessarily correspond to the security's risk level as perceived by the market.").

Nor can plaintiffs justify their reliance on allegedly false computational data.  The loan-level analysis by which they now purport to show the falsity of that data only demonstrates the type of review that plaintiffs could have undertaken at the time of their investments.

## III.   PLAINTIFFS FAIL TO PLEAD THE OTHER ELEMENTS OF FRAUD, AND DO NOT STATE A CLAIM FOR NEGLIGENT MISREPRESENTATION

Plaintiffs attempt to allege the remaining elements of plaintiffs' fraud claims— scienter, loss causation, and damages—as well as the negligent misrepresentation claims, in a similar fashion as the Original Complaints.  As discussed below, and for the reasons set forth in defendants' original motion papers, all of these claims should be dismissed.

### A.      Plaintiffs Fail to Plead Scienter, Loss Causation, and Damages

To plead scienter, plaintiffs must raise a "strong inference of fraudulent intent." *Lerner*, 459 F.3d at 290.  This burden cannot be satisfied on the basis of mere "speculation and conclusory allegations."  *Kalnit* v. *Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (internal quotation marks omitted).  Plaintiffs have not remedied the deficiencies in their scienter allegations:

- As before, plaintiffs' allegations concerning DBSI employee Greg Lippmann, Dexia AC ¶¶ 120-40; TIAA AC ¶¶ 113-32, do not support the proposition that Lippmann possessed undisclosed knowledge about problems with the Underlying Loans.  DB at 31-32; DR at 10-11.

28

- Plaintiffs try to predicate defendants' scienter on due diligence information that they allegedly received from Clayton and other vendors.  Dexia AC ¶¶ 67-87; TIAA AC ¶¶ 63-79.  Yet plaintiffs fail to tie these allegations to any of the Underlying Loans or Offerings, and most of their allegations are flatly contradicted by the very documents on which they rely.  DB at 33-35; DR at 9-10.

- Plaintiffs contend that defendants knew about the undisclosed risks from their mortgage lender subsidiaries, MortgageIT and DB Home, and from Originators to whom they extended warehouse credit.  Dexia AC ¶¶ 94-102, 113-18; TIAA AC ¶¶ 86-94, 99-104.  Yet scienter cannot be inferred from a mere parent-subsidiary relationship, particularly for Offerings backed by loans issued before MortgageIT and DB Home were acquired.  DB at 36-37.  And plaintiffs' allegations about warehouse lending are insufficiently particularized to support an inference of scienter.  DB at 35-36.

Plaintiffs also now purport to establish scienter based on the conclusions of their loan level analysis.  Dexia AC ¶ 69; TIAA AC ¶ 62.  But even if plaintiffs could establish a misstatement based on that analysis (and, as discussed above, they cannot), they nevertheless fail to allege sufficient additional circumstantial facts of defendants' knowledge.  *See Landesbank Baden-Württemberg* v. *Goldman, Sachs & Co.*, 821 F. Supp. 2d 616, 621-22 (S.D.N.Y. 2011), *aff'd*, 478 F. App'x 679 (2d Cir. 2012).

The Amended Complaints also fail to plead loss causation or damages.  Plaintiffs allege in conclusory fashion that their losses were caused by defendants' alleged misstatements.  Dexia AC ¶ 313-14; TIAA AC ¶ 261-62.  Yet they do not allege facts sufficient to show that those losses are attributable to defendants' conduct rather than the ensuing global financial crisis.  DB at 37-39; DR at 14-16.[36]

---

[36]   Plaintiffs' claim for aiding and abetting fraud should also be dismissed.  To state such a claim, a plaintiff must adequately plead the existence of a primary tort.  *See Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co. Inc.*, 651 F. Supp. 2d 155, 186 (S.D.N.Y. 2009).  Plaintiffs have not done so here.

**B.      Plaintiffs Fail to State a Claim for Negligent Misrepresentation**

As before, plaintiffs allege that defendants possessed "unique and special knowledge" about the Underlying Loans, Dexia AC ¶ 343; TIAA AC ¶ 291, and that the parties had a "longstanding relationship" of "more than two years."  Dexia AC ¶ 345; TIAA AC ¶ 293. However, these allegations are insufficient to plead a "special relationship," which is a necessary element of negligent misrepresentation under New York law.  DB at 41-44; DR at 16-17.

**IV.      THE DEXIA PLAINTIFFS DO NOT HAVE STANDING**

The Dexia Amended Complaint should be dismissed because the Dexia plaintiffs do not have standing.  In its bottom-line Order dismissing the Dexia action, the Court stated that the action "need not have been dismissed on standing grounds ***at this stage*** of the litigation." *Dexia* v. *DB* Order at 2 (emphasis added).  Although this action is still at the pleading stage, Dexia's Amended Complaint now identifies the operative document and alleges facts concerning its standing that were absent in its Original Complaint.  Based on those facts, the Court may determine now, as a matter of law, that: (i) plaintiff FSAM, the entity that invested in each of the Certificates, was made whole for its investments and therefore has no claim; (ii) FSAM's assignment of all "right, title and interest" in the Certificates to other Dexia plaintiffs (Dexia SA/NV, DCL, and DHI) (collectively, the "Dexia Entities") did not transfer FSAM's right to bring tort claims based on the Offerings; and (iii) the Dexia Entities cannot establish standing based on equitable subrogation.

**A.      FSAM Suffered No Injury**

The Dexia Amended Complaint alleges that FSAM, the sole purchaser of the Certificates, "assigned and transferred" the Certificates to DCL pursuant to a June 30, 2009 agreement between FSAM, Dexia SA/NV, and DCL.  *See* Dexia AC ¶¶ 20, 22.  That agreement—the "Put Option Confirmation – Guaranteed Put Contract" (the "Put Contract")

30

explicitly identified in the Amended Complaint, Dexia AC ¶ 22—provided that DCL would pay

FSAM either the face value or the market value of each of the Certificates that FSAM transferred

to DCL.  (Ex. 49 at 12-13).  Although only vaguely alleged in the Amended Complaint, Dexia

AC ¶ 23, the Dexia plaintiffs have repeatedly confirmed that [DCL] elected to pay FSAM the

face value of the Certificates.  *See* Oral Arg. Tr. at 26:15-17 (Ex. 10) ("DCL would give the

purchasing entity, [FSAM], effectively, the face value of the security.").[37]  Because FSAM has

been made whole for its investment in the Certificates, it lacks standing.  *Toho Bussan Kaisha,*

*Ltd.* v. *Am. President Lines, Ltd.*, 265 F.2d 418, 420 (2d Cir. 1959) ("one who has been

defrauded . . . may not recover if he has already recouped his actual pecuniary loss from others");

*In re UBS Auction Rate Sec. Litig.*, 2009 WL 860812, at *5-6 (S.D.N.Y. Mar. 30, 2009)

(holding, on a motion to dismiss, that plaintiffs who received full refund of purchase price on

securities lacked standing).

> **B.      The Dexia Entities Do Not Have Standing**

The Dexia Entities did not purchase the Certificates from defendants and

therefore base their standing exclusively on the Put Contract, which they claim resulted in the

transfer by FSAM of not only the RMBS Certificates, but also of all tort claims relating to the

Certificates.  Specifically, Dexia alleges that pursuant to the Put Contract, "FSAM assigned and

transferred the Deutsche Bank RMBS, including 'all right, title and interest' in the Deutsche

Bank RMBS assets (including all rights and remedies sought in this action), to DCL."  Dexia AC

¶ 22.  Because these allegations are belied by the plain language of the Put Contract, the Court

need not accept them as true on a motion to dismiss.  *In re Livent, Inc. Noteholders Sec. Litig.*,

---

[37]   Indeed, discovery in the *Bear Stearns* Action confirms that FSAM actually received far in
       excess of its purchase price in return for its investments.  *See* Mem. of Law in Support of
       Bear Stearns Defendants' Motion for Summary Judgment 11 n.8 (Ex. 50).

31

151 F. Supp. 2d 371, 405 (S.D.N.Y. 2001) ("a court need not feel constrained to accept as truth conflicting pleadings . . . that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely").

       The Put Contract states that upon either FSAM's or DCL's election, FSAM would "convey all right, title and interest in the Put Settlement Assets [a list of securities that includes the Certificates] to Dexia or DCL." (Ex. 49 at 6, 11, Annex 1). New York law is clear that tort claims are not transferred with an asset unless there is an explicit assignment of those claims. *Banque Arabe et Internationale D'Investissement* v. *Maryland Nat'l Bank*, 57 F.3d 146, 151-52 (2d Cir. 1995) (citing *Fox* v. *Hirschfield*, 142 N.Y.S. 261, 262-63 (1st Dep't 1913) "for the proposition that the assignment of fraud claims must be explicit"). An assignment of "all right, title and interest" in an asset is therefore insufficient to assign tort claims relating to that asset. For example, in *California Public Employees' Retirement System* v. *Shearman & Sterling*, 95 N.Y.2d 427, 432 (2000), the New York Court of Appeals affirmed the dismissal of claims relating to a loan that were brought by an entity that had been assigned "right, title and interest in, to and under the [loan] documents." *Id.* (alteration in original). Citing the Second Circuit's decision in *Banque Arabe*, the court held that because the assignment "refers only to rights and interests under the loan documents . . . and does not refer to the overall loan transaction," the assignment "did not include a cause of action arising outside the loan documents themselves" and therefore did not include an assignment of the malpractice claims at issue. *Id.* at 435-36; *see also Consol. Edison, Inc.* v. *Ne. Utils.*, 318 F. Supp. 2d 181, 188 (S.D.N.Y. 2004) (holding that transfer of "all rights in the security" did not encompass "all rights *related to* the security or *accrued while possessing* the security"), *rev'd in part on other grounds*, 426 F.3d 524 (2d Cir. 2005).

32

So, too, here.  The Put Contract refers only to the transfer of the Put Settlement Assets—here, the Certificates—and fails to mention the transfer of tort claims relating to the Certificates.  The Dexia Entities are therefore limited to bringing contractual claims relating to the Certificates; they do not have standing to assert the claims in the Amended Complaint.  *See* Defendants' Supplemental Memorandum of Law on the Issue of Dexia Plaintiffs' Standing dated December 13, 2011 at 3-4.  This makes sense because otherwise all sales of securities would automatically transfer the tort claims of the seller.  Indeed, if this were the case—and tort claims were automatically transferred along with securities despite the absence of an explicit assignment of such claims—then the Dexia plaintiffs, having sold all of the Certificates between May 2010 and September 2011, would still lack standing.

### C. Equitable Subrogation Principles Do Not Save the Dexia Entities' Claims

The Dexia Entities may claim to have standing based on equitable subrogation.  Equitable subrogation, however, applies where "'one party pays a debt for which another is primarily answerable and which in equity and good conscience should have been discharged by the latter, [and] the payment was made either [i] under compulsion or for the protection of some interest of the party making the payment, and [ii] in discharge of an existing liability.'"  *Hamlet at Willow Creek Dev. Co.* v. *Ne. Land Dev. Corp*, 64 A.D.3d 85, 106 (2d Dep't 2009) (quoting *Gerseta Corp.* v. *Equitable Trust Co. of New York*, 241 N.Y. 418, 425-26 (1926)).

Equitable subrogation does not apply here.

First, there is simply nothing inequitable.  The Put Contract was negotiated by highly sophisticated parties in 2009, following the collapse of the mortgage market, and after numerous lawsuits had been filed by investors in RMBS.  The Dexia Entities could have included a provision in the Put Contract explicitly assigning any tort claims relating to the Certificates.  They failed to do so.  They also failed to file any lawsuits against the banks that

33

sold them the RMBS for two years—well after the statute of limitations had run on their claims under the Securities Act.  While the Dexia plaintiffs' motivations are irrelevant given the unambiguous terms of the Put Contract, we suspect they did not do so because they did not believe they had any claims.

Second, the Dexia plaintiffs do not allege that DCL's election to pay FSAM face value for the certificates was done "under compulsion" or to protect some interest of DCL.  *See Nat'l Granite Title Ins. Agency, Inc.* v. *Cadlerock Props. Joint Venture, Ltd.*, 5 A.D.3d 361, 361 (2d Dep't 2004) (equitable subrogation applies only where a party "has a legal duty to pay the debts of another for the protection of some benefit").  Although the Dexia plaintiffs allege that the payments from DCL were "required" under the Put Contract and "necessary" as a result of defendants' alleged fraud, Dexia AC ¶¶ 23-24, those allegations are conclusory and contradicted by the terms of the Put Contract, which gave DCL the option to pay FSAM market value for the Certificates under certain circumstances.  (Ex. 49 at 16).  The Dexia Entities cannot base standing on payments they made voluntarily.  *Bermuda Trust Co. Ltd.* v. *Ameropan Oil Corp.*, 266 A.D.2d 251, 251 (2d Dep't 1999).

Finally, the Dexia Entities were not paying an "existing" debt owed by FSAM. Indeed, at the time of the sale, FSAM had not even filed suit against defendants, much less obtained a judgment.  *See Hamlet at Willow Creek*, 64 A.D.3d at 106.

34

**CONCLUSION**

Plaintiffs have been given a second chance to plead their claims with particularity

and failed.  For the foregoing reasons, defendants' motion to dismiss the Amended Complaints

should be granted, and the Amended Complaints should be dismissed with prejudice.


Dated:   New York, New York
         March 21, 2013

                        PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP


                        By:   ___S/ Moses Silverman_____

                              Moses Silverman (msilverman@paulweiss.com)
                              H. Christopher Boehning (cboehning@paulweiss.com)
                              Jessica S. Carey (jcarey@paulweiss.com)
                              Michael Klunder (mklunder@paulweiss.com)
                              Alexander S. Elson (aelson@paulweiss.com)

                        1285 Avenue of the Americas
                        New York, NY 10019
                        Tel. (212) 373-3000
                        Fax (212) 757-3990

                        *Attorneys for Defendants Deutsche Bank AG, Deutsche Bank
                        Securities Inc., DB Structured Products Inc., Ace Securities Corp.,
                        and Deutsche Alt-A Securities Inc.*

Doc#: US1:8453110v1