**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DEXIA SA/NV, DEXIA HOLDINGS, INC., FSA ASSET MANAGEMENT LLC, and DEXIA CRÉDIT LOCAL SA,<br><br><br>Plaintiffs,<br><br>v.<br><br>DEUTSCHE BANK AG, DEUTSCHE BANK SECURITIES INC., DB STRUCTURED PRODUCTS INC., ACE SECURITIES CORP., and DEUTSCHE ALT-A SECURITIES INC.,<br><br>Defendants. | 11 Civ. 5672 (JSR) |
| TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA,<br><br><br>Plaintiffs,<br><br>v.<br><br>DEUTSCHE BANK AG, DEUTSCHE BANK SECURITES INC., DB STRUCTURED PRODUCTS INC., ACE SECURITIES CORP., and DEUTSCHE ALT-A SECURITIES INC.,<br><br>Defendants. | 11 Civ. 6141 (JSR) |

**PLAINTIFFS' MEMORANDUM OF LAW IN**
**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**
**AND THE DEXIA PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT**
**OF THEIR MOTION FOR LEAVE TO FILE A SUPPLEMENTAL COMPLAINT**
<u>**PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 15(d)**</u>

**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**
1285 Avenue of the Americas, 38th Floor
New York, New York  10019
Tel:  (212) 554-1400
Fax: (212) 554-1444

*Attorneys for Plaintiffs Dexia SA/NV,*
*Dexia Holdings, Inc., FSA Asset*
*Management, Inc., Dexia Crédit Local*
*SA, and Teachers Insurance and Annuity*
*Association of America*

Dated:  May 31, 2013

## TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ............................................................................ 1

STATEMENT OF FACTS ................................................................................. 3

    I.       Deutsche Bank's Securitization Machine ............................................. 3

    II.     The Undisclosed Truth About Deutsche Bank's Securitizations And Due Diligence ............................................................................................. 5

    III.    Deutsche Bank Conceals Material Information From The Ratings Agencies ............................................................................................ 7

    IV.    The RMBS Are Downgraded To Junk .............................................. 8

ARGUMENT ............................................................................................... 8

    I.       Plaintiffs Have Stated A Claim For Fraud And Fraudulent Inducement ............... 9

        A.    The Complaints Adequately Plead Actual, Justifiable Reliance ............... 9

        B.    The Complaints Adequately Allege Material Misstatements And Omissions ..................................................................................... 17

               1.    Defendants Misrepresented Loan Underwriting And Selection ......................................................................... 17

               2.    Defendants Misrepresented Appraisals And LTVs ..................... 20

               3.    Defendants' Actionable Misrepresentations Regarding Credit Ratings ......................................................... 21

               4.    Defendants' Misrepresentations Regarding the Risk of Default, Including Owner Occupancy Rates, DTIs, and Credit Scores ........................................................... 23

               5.    Deutsche Bank Misrepresented Its Intent to Transfer Title ......... 25

        C.    The Complaints Adequately Plead Scienter ............................... 25

        D.    The Complaints Adequately Plead Loss Causation ........................ 28

    II.     Plaintiffs Have Stated A Claim For Negligent Misrepresentation .............. 29

    III.    Dexia Has Standing To Bring This Action ...................................... 29

i

A.    DCL Has Standing As FSAM's Assignee ................................................. 29

B.    The Court Should Grant Dexia Leave To Supplement The
      Complaint............................................................................................... 32

C.    DCL Has Standing As FSAM's Equitable Subrogee .............................. 34

CONCLUSION........................................................................................................... 36

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*627 Acquisition Co. v. 627 Greenwich, LLC,*
   85 A.D.3d 645 (1st Dep't 2011) ............................................................25

*Abu Dhabi Commerc'l Bank v. Morgan Stanley & Co., Inc.,*
   651 F. Supp. 2d 155 (S.D.N.Y. 2009)............................................10, 22, 28

*Algonquin Power Income Fund v. Christine Falls of N.Y.,*
   No. 11-cv-4945-BK, 2013 WL 336002
   (2d Cir. Jan. 30, 2013) ......................................................................30

*Allstate Ins. Co. v. ACE Sec. Corp.,*
   Index No. 650431/2011 (Sup. Ct. Mar. 15, 2013) ............................... *passim*

*Allstate Ins. Co. v. Countrywide Fin. Corp.,*
   824 F.Supp.2d 1164 (C.D. Cal. 2011) ............................................. *passim*

*Allstate Ins. Co. v. Merrill Lynch & Co.,*
   Index No. 650559/2011 (Sup. Ct. Mar. 15, 2013) ...............................21, 23

*Allstate Ins. Co. v. Morgan Stanley,*
   Index No. 651840/11 (1st Dep't 2013) ...........................................16, 17

*Am. Fin. Int'l Grp.-Asia, L.L.C. v. Bennett,*
   No. 05-cv-8988-GEL, 2007 WL 1732427
   (S.D.N.Y. June 14, 2007).....................................................................12

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
   493 F. 3d 87 (2d Cir. 2007)..............................................................8, 9

*Bank Hapoalim B.M. v. Bank of Am. Corp.,*
   No. 12-cv-4316-MRP, 2012 WL 6814194
   (C.D. Cal. Dec. 21, 2012) ...................................................................21

*Banque Arabe et Intenationale D'Investissement v. Maryland Nat. Bank,*
   57 F.3d 146 (2d Cir. 1995)..................................................................31

*Carbon Cap. Mgmt. LLC v. Am. Exp. Co.,*
   88 A.D.3d 933 (2d Dep't 2011)............................................................35

*Castellano v. Young & Rubicam, Inc.,*
   257 F.3d 171 (2d Cir. 2001)................................................................28

*CIFG v. Goldman, Sachs & Co.*,
   Index No. 652286/2011, 2013 WL 1876243
   (1st Dep't May 7, 2013)................................................................17

*Coakley v. N.Y.*,
   196 N.Y.S.2d 793 (N.Y. Ct. Cl. 1960)..........................................31

*Consarc Corp. v. Marine Midland Bank, N.A.*,
   996 F.2d 568 (2d Cir. 1993)...........................................................31

*Devaney v. Chester*,
   709 F. Supp. 1255 (S.D.N.Y 1989)................................................10

*Dexia Holdings, Inc. v. Countrywide Fin. Corp.*,
   No. 11-cv-07165-MRP, 2012 WL 1798997
   (C.D.Cal. Feb. 17, 2012).................................................................25

*Dexia SA/NV v. Bear, Stearns & Co.*,
   No. 12-cv-4761-JSR, 2013 WL 856499
   (S.D.N.Y. Feb. 27, 2013) ...................................................... *passim*

*Dexia SA/NV v. Deutsche Bank AG*,
   No. 11-cv-5672-JSR, 2013 WL 98063
   (S.D.N.Y. Jan. 4, 2013).......................................................... *passim*

*Dodona I v. Goldman Sachs*,
   847 F. Supp. 2d 624 (S.D.N.Y. 2012)......................................27, 28

*Emps. Ret. Sys. of Gov't of Virgin Islands v. Morgan Stanley & Co., Inc.*,
   814 F. Supp. 2d 344 (S.D.N.Y. 2011)............................................23

*Fed. Ins. Co. v. Am. Ins. Co.*,
   258 A.D.2d 39 (1st Dept. 1999)......................................................31

*FHFA v. Bank of Am. Corp.*,
   No. 11-cv-6195-DLC, 2012 WL 6592251
   (S.D.N.Y. Dec. 18, 2012) ...............................................................12

*FHFA v. Deutsche Bank AG*,
   No. 11-cv-6192-DLC, 2012 WL 5471864
   (S.D.N.Y. Nov. 12, 2012) ..............................................9, 10, 12, 18

*FHFA v. JPMorgan Chase & Co.*,
   No. 11-cv-6188-DLC, 2012 WL 5395646
   (S.D.N.Y. Nov. 5, 2012) .............................................15, 16, 27, 28

*FHFA v. UBS Americas, Inc.*,
   858 F. Supp. 2d 306 (S.D.N.Y. 2012)......................................16, 18

*Footbridge Ltd. v. Countrywide Home Loans, Inc.*,
  No. 09-cv-4050-PKC, 2010 WL 3790810
  (S.D.N.Y. Sept. 28, 2010) ...................................................................................23

*Gabriel Capital, L.P. v. NatWest Fin. Inc.*,
  177 F. Supp. 2d 169 (S.D.N.Y. 2001) ...............................................................10

*Gerseta Corp. v. Equitable Trust Co. of N.Y.*,
  241 N.Y. 418 (1926) ...........................................................................................35

*Global Network Communications, Inc. v. City of New York*,
  458 F.3d 150 (2d Cir. 2006) ...............................................................................14

*Granite Partners, L.P. v. Bear, Stearns & Co.*,
  58 F. Supp. 2d 228 (S.D.N.Y. 1999) ..................................................................12

*Hamlet at Willow Creek Dev. Co. v. Ne. Land Dev. Co.*,
  64 A.D.3d 85 (2d Dep't 2009) ......................................................................34, 35

*HSH Nordbank AG v. UBS AG*,
  95 A.D.3d 185 (1st Dep't 2012) .........................................................................15

*Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*,
  159 F.3d 723 (2d Cir. 1998) ...............................................................................18

*Hutchison v. Deutsche Bank Sec. Inc.*,
  647 F.3d 479 (2d Cir. 2011) ...............................................................................20

*In re Ambac Fin. Grp. Inc. Sec. Litig.*,
  693 F. Supp. 2d 241 (S.D.N.Y. 2010) ................................................................28

*In re Bear, Stearns Mortg. Pass-Through Cert. Litig.*,
  851 F. Supp. 2d 746 (S.D.N.Y. 2012) ..........................................................21, 22

*In re Countrywide Fin. Corp. Mort.-Backed Sec. Litig.*,
  No. 11-ml-02265-MRP, 2013 WL 1189311
  (C.D. Cal. Mar. 15, 2013) ...................................................................................21

*In re JWP Inc. Sec. Litig.*,
  928 F. Supp. 1239 (S.D.N.Y. 1996) ...................................................................13

*In re Morgan Stanley Pass-Through*,
  810 F. Supp. 2d 650 (S.D.N.Y. 2011) ................................................................18

*In re SLM Corp. Sec. Litig.*,
  740 F. Supp. 2d 542 (S.D.N.Y. 2010) ................................................................23

*Int'l Design Concepts LLC v. Saks Inc.*,
    486 F. Supp. 2d 229 (S.D.N.Y. 2007)....................................................................30

*JA Apparel Corp. v. Abboud*,
    568 F.3d 390 (2d Cir. 2009)................................................................................30

*Jo Ann Homes at Bellmore v. Dworetz*,
    250 N.E. 2d 214 (N.Y. 1969)...............................................................................9

*King Cnty. Wash. v. IKB Deutsche Industriebank AG*,
    751 F. Supp. 2d 652 (S.D.N.Y. 2010)..............................................................15, 29

*Landes v. Sullivan*,
    235 A.D.2d 657 (3d Dep't 1997).........................................................................25

*Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co.*,
    No. 11-cv-4443, 2012 WL 1352590 (2d Cir. Apr. 19, 2012)................................27

*M&T Bank Corp. v. Gemstone CDO VII, Ltd.*,
    Index. No. 7064/2008, 2009 WL 921381 (Sup. Ct. Apr. 7, 2009),
    *aff'd,  M&T Bank Corp. v. Gemstone CDO VII, Ltd.*,
    891 N.Y.S. 2d 578 (4th Dep't 2009)...................................................................22

*Mass. Mut. Life Ins. Co. v. Res. Funding Co., LLC*,
    843 F. Supp. 2d 191 (D. Mass 2012) .................................................................21

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*,
    928 N.Y.S. 2d 229 (1st Dept. 2011) ..............................................................21, 28

*N.J. Carpenters H'lth Fund v. Res. Capital, LLC*,
    No. 08-cv-8781-HB, 2011 WL 2020260
    (S.D.N.Y. May 19, 2011).....................................................................................17

*N.J. Carpenters H'lth Fund v. DLJ Mortg. Capital, Inc.*,
    No. 08-cv-5653-PAC, 2010 WL 1473288
    (S.D.N.Y. Mar. 29, 2010) ...................................................................................23

*North Fork Bank v. Cohen & Krassner*,
    44 A.D.3d 375 (1st Dept. 2007)....................................................29, 30, 31, 32

*Ouaknine v. MacFarlane*,
    897 F.2d 75 (2d Cir. 1990).................................................................................9

*Perez v. Fiore*,
    78 A.D.3d 1143 (2d Dept. 2010) .......................................................................35

*Phoenix Light SF Ltd. v. ACE Sec. Corp.*,
    39 Misc. 3d 1218(A) (Sup. Ct. Apr. 24, 2013) ............................................. *passim*

*Plumbers' & Pipefitters' Local No. 562 Suppl. Plan & Trust v.*
   *J.P. Morgan Accept. Corp.*, No. 08-cv-1713-ERK-WDW,
   2012 WL 601448 (E.D.N.Y. Feb. 23, 2012).........................18

*Plumbers' Union v. Nomura Acceptance Corp.*,
   632 F.3d 762 (1st Cir. 2011)..........................................20

*Premier-N.Y., Inc. v. Travelers Prop. Cas. Corp.*,
   867 N.Y.S.2d 20, 2008 WL 2676800
   (Sup. Ct. June 8, 2008).................................................13

*Pro Bono Invs., Inc. v. Gerry*,
   No. 03-cv-4347-JGK, 2008 WL 4755760
   (S.D.N.Y. Oct. 29, 2008) .............................................30

*Prudential Ins. Co. of Am. v. Goldman, Sachs & Co.*,
   No. 12-cv-6590-SDW-MCA, 2013  WL 1431680
   (D.N.J. Apr. 9, 2013) ...............................................21, 25

*Quaratino v. Tiffany & Co.*,
   71 F.3d 58 (2d Cir. 1995) ..........................................33, 34

*Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.*,
   No. 09-cv-1110-HB, 2011 WL 135821
   (S.D.N.Y. Jan. 12, 2011)..............................................16

*Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.*,
   714 F. Supp. 2d 475 (S.D.N.Y. 2010).............................18

*Ret. Sys. of CA. v. Shearman & Sterling*,
   95 N.Y.2d 427 (2000) .................................................32

*Rivera v. Dyett*,
   No. 88-cv-4707-PKL, 1993 WL 54652
   (S.D.N.Y. Feb. 16, 1993)..............................................33

*Riverhead Park Corp. v. Cardinale*,
   881 F. Supp. 2d 376 (E.D.N.Y. July 26, 2010)...................33

*Rosenblum v. Dingfelder*,
   111 F.2d 406 (2d Cir. 1940)...........................................31

*Schwartz v. ThinkStrategy Cap. Mgmt. LLC*,
   No. 09-cv-9346-PAE, 2012 WL 2026365
   (S.D.N.Y. May 31, 2012)..............................................13

*Sec. Investor Prot. Corp. v. BDO Seidman*,
   95 N.Y.2d 702 (2001) .................................................10

*Seiden Assocs., Inc. v. ANC Holdings, Inc.*,
    959 F.2d 425 (2d Cir. 1992)................................................................30

*Singer Co. v. Stott & Davis Motor Express, Inc.*,
    79 A.D.2d 227 (4th Dep't 1981) ........................................................10

*Small v. Lorillard Tobacco Co.*,
    252 A.D. 2d 1 (1st Dep't 1998) .........................................................12

*Sprint Commc'ns Co. v. APCC Servs., Inc.*,
    554 U.S. 269 (2008)...........................................................................32

*St. John's Univ., N.Y. v. Bolton*,
    757 F. Supp. 2d 144 (E.D.N.Y. 2010) ..............................................13

*Stewardship Credit Arbitrage Fund LLC v. Charles Zucker Culture Pearl Corp.*,
    Index No. 600634/2010, 2011 WL 1744217
    (Sup. Ct. May 4, 2011)...........................................................29, 30, 32

*Stichting Pensioenfonds ABP v. ACE Sec. Corp.*,
    Index No. 652460/2011 (Sup. Ct. 2011)..........................................9, 18

*Stichting Pensioenfonds ABP v. Credit Suisse Group AG*,
    Index No. 653665/2011, 2012 WL 6929336
    (Sup. Ct. Nov. 30, 2012)........................................................22, 25, 27

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*,
    250 F.3d 87 (2d Cir. 2001) ................................................................29

*Taylor v. VT Dep't of Educ.*,
    313 F.3d 768 (2d Cir. 2002)...............................................................14

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*,
    692 F. Supp. 2d 387 (S.D.N.Y. 2010)...............................................23

*Turtur v. Rothschild Registry Int'l, Inc.*,
    No. 92-cv-8710-RPP, 1993 WL 338205
    (S.D.N.Y. August 27, 1993) ..............................................................10

*Williams v. Sidley Austin Brown & Wood*,
    38 A.D.3d 219 (1st Dep't 2007) ........................................................19

## STATUTES AND RULES

17 C.F.R. § 229.1110.................................................................................20

17 C.F.R. §230.159............................................................................13, 14

17 C.F.R. § 230.433 .................................................................................................................12

70 Fed. Reg. 1506-01, 1557 (Jan. 7, 2005)................................................................................14

Fed. R. Civ. P. 15(d) ...............................................................................................................32

## GLOSSARY

The following defined terms have the following meanings as used herein:

- "Action" refers to the above-captioned litigations.

- "ARM" refers to adjustable-rate mortgage loans.

- "AVM" refers to automated valuation model.  AVMs rely on similar data as appraisers – *e.g.*, county assessor records, tax tools, and data on comparable properties, and then apply modeling techniques to generate independent, statistically driven valuations, as defined and described in ¶203 of the TIAA Complaint and in ¶254 of the Dexia Complaint.

- "CDO" refers to a collateralized debt obligation.

- "Certificates" refers to the residential mortgage-backed securities at issue in this Action, as defined and described in ¶3 of the TIAA Complaint and in ¶3 of the Dexia Complaint. Each of TIAA's and FSAM's purchases is set forth in ¶33 of the TIAA Complaint and in ¶33 of the Dexia Complaint, respectively.

- "Clayton" refers to Clayton Holdings, Inc., a third-party due diligence provider hired by Defendants to conduct due diligence on mortgage loans.

- "CLTV" refers to a combined-loan-to-value ratio.

- "Complaints" refers to the TIAA Complaint and the Dexia Complaint.

- "CRA" refers to a credit ratings agency that provided a credit rating for the RMBS, including Moody's, Standard & Poor's and Fitch Ratings.

- "CW" refers to confidential witness; "CW _" refers to the corresponding confidential witness in the TIAA Complaint and the Dexia Complaint.

- Citations to "DB" are to pages of Defendants' Memorandum of Law in support of their Motion to Dismiss, filed in this Action on March 23, 2013.

- "DBAG" refers to Defendant Deutsche Bank AG, as defined and described in ¶18 of the TIAA Complaint and ¶25 of the Dexia Complaint.

- "DB Order" refers to *Dexia SA/NV v. Deutsche Bank AG*, 2013 WL 98063 (S.D.N.Y. Jan. 4, 2013), the Court's prior order dismissing, without prejudice, the Complaints.

- "DB RMBS" refers to the Dexia RMBS and the TIAA RMBS.

- "DBSI" refers to Defendant Deutsche Bank Securities Inc., as defined and described in ¶19 of the TIAA Complaint and in ¶26 of the Dexia Complaint.

- "DBSP" refers to Defendant DB Structured Products, Inc., as defined and described in ¶20 of the TIAA Complaint and in ¶27 of the Dexia Complaint.

- "DCL" refers to Plaintiff Dexia Crédit Local SA, as defined and described in ¶18 of the Dexia Complaint.

- "Deutsche Bank" or "Defendants" refers to the Defendants, as defined and described in ¶¶18-22 of the TIAA Complaint and in ¶¶25-29 of the Dexia Complaint.

- Citations to "Dexia ¶¶__" refer to the corresponding paragraphs in the Dexia Complaint.

- "Dexia Certificates" refers to those Certificates identified at ¶40 of the Dexia Complaint.

- "Dexia Complaint" refers to Dexia's Amended Complaint, served on February 4, 2013.

- "Dexia Ex.__" refers to the Exhibits to the Dexia Complaint.

- "Dexia Plaintiffs" or "Dexia" refers to, collectively, Dexia SA/NV, Dexia Crédit Local SA, Dexia Holdings, Inc., and FSA Asset Management, as defined and described in ¶¶17-20 of the Dexia Complaint,

-  "Dexia RMBS" refers to those RMBS identified at ¶15 of the Dexia Complaint.

- "Dexia SA" refers to Plaintiff Dexia SA/NV, as defined and described in ¶17 of the Dexia Complaint.

- "DHI" refers to Plaintiff Dexia Holdings, Inc., as defined and described in ¶19 of the Dexia Complaint.

- "DTI" refers to debt-to-income ratio.

- "FCIC" refers to the Financial Crisis Inquiry Commission, which was the national commission established to examine the causes of the financial and economic crisis in the United States.

- "FSAI" refers to non-party Financial Security Assurance Inc.

- "FSAM" refers to Plaintiff FSA Asset Management LLC, as defined and described in ¶20 of the Dexia Complaint.

- "FWP" means free-writing prospectus or draft prospectus supplement.

- "JPM Order" refers to *Dexia SA/NV v. Bear, Stearns & Co.*, 2013 WL 856499 (S.D.N.Y. Feb. 27, 2013), the Court's decision denying the JPMorgan defendants' motion to dismiss.

- "Klunder Ex.__" refers to the exhibits to the Declaration of Michael Klunder in Support of Defendants' Motion to Dismiss, dated March 21, 2013.

- "LTV" refers to loan-to-value ratio.

- "Lydian" refers to Lydian Data Services, a third-party due diligence provider hired by Defendants to conduct due diligence on mortgage loans.

- "MBS" refers to mortgage-backed securities.

- "Offerings" refers to the offerings of the mortgage pass-through certificates identified in ¶33 of the TIAA Complaint and in ¶40 of the Dexia Complaint.

- "Offering Materials" refers to the prospectuses, draft prospectus supplements, prospectus supplements, computational materials, term sheets, and other marketing materials prepared by Defendants, and provided to Plaintiffs FSAM and TIAA by Defendant DBSI, as defined and described in ¶3 of the TIAA Complaint and in ¶3 of the Dexia Complaint.

- "Plaintiffs" refers to, collectively, Dexia SA/NV, Dexia Crédit Local SA, Dexia Holdings, Inc., and FSA Asset Management LLC, as defined and described in ¶¶17-20 of the Dexia Complaint, and TIAA, as defined and described in ¶17 of the TIAA Complaint.

- "ProSupps" refers to prospectus supplements.

- "PSLRA" refers to the Private Securities Litigation Reform Act.

- "Put Contract" refers to the ISDA Master Agreement, Schedule and Credit Support Annex among Dexia SA, DCL, and FSAM dated as of June 30, 2009, attached as Appendix A to Defendants' December 13, 2011 Supplemental Memorandum of Law on the Issue of Dexia Plaintiffs' Standing, 11 Civ. 5672, ECF No. 46.

- "Ratification" refers to the letter ratification regarding Claims with Respect to the Certificates Listed on Exhibit A, executed by FSA Asset Management LLC, Dexia SA/NV, and Dexia Crédit Local, acting through its New York Branch, dated April 24, 2013, attached as Exhibit H to Wales Ex. A.

- "REO" refers to real estate owned properties, which are properties owned by a bank after an unsuccessful foreclosure action.

- "RMBS" refers to residential mortgage-backed securities.

- "Rule 159" refers to SEC Rule 159, Information Available to Purchaser at Time of Contract of Sale, 17 C.F.R. §230.159.

- "TIAA" refers to Plaintiff Teachers Insurance and Annuity Association of America, as defined and described in ¶17 of the TIAA Complaint.

- Citations to "TIAA ¶¶__" refer to the corresponding paragraphs of the TIAA Complaint.

- "TIAA Certificates" refers to those Certificates identified at ¶33 of the TIAA Complaint.

- "TIAA Complaint" refers to TIAA's Amended Complaint, served on February 4, 2013.

- "TIAA RMBS" refers to those RMBS identified at ¶15 of the TIAA Complaint.

- "Wales Ex. __" refers to the exhibits to the Declaration of David L. Wales submitted in support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss and The Dexia Plaintiffs' Memorandum of Law in Support of their Motion for Leave to File a Supplemental Complaint Pursuant to Federal Rule of Civil Procedure 15(d).

## <u>PRELIMINARY STATEMENT</u>

This action concerns Deutsche Bank's egregious fraud in creating, issuing, underwriting and selling RMBS that it ***knew*** were toxic and destined to fail, while simultaneously representing to TIAA and FSAM that the underlying loans met stated origination standards; the underlying mortgage pools were characterized by specified LTV ratios, DTI limits, and occupancy rates; the collateral for the loans had been independently appraised in accordance with industry standards; and the Certificates merited their investment grade (and primarily AAA) ratings. As the Court recognized in the DB Order, at the same time that Defendants structured their RMBS, their third-party due diligence providers were reporting to Defendants that ***1/3*** of the loans they reviewed for Deutsche Bank contained "egregious" deficiencies. All the while, led by Greg Lippmann, Defendants amassed a ***$10 billion*** short position against the RMBS they were simultaneously selling to investors, including TIAA and FSAM. Indeed, the Shorting Report contained Defendants' own "strictly confidential" analyses of the impact of the failure to properly calculate DTI ratios for the loans underlying RMBS. Unaware that Deutsche Bank secretly viewed its RMBS as ***"pigs," "crap,"*** and ***"generally horrible,"*** TIAA and FSAM purchased hundreds of millions of dollars of RMBS in reliance on Defendants' misrepresentations.[1] The Certificates have all been downgraded to "junk" and Plaintiffs have suffered huge losses.

The Court recognized the strength of Plaintiffs' underlying fraud case in the DB Order, dismissing the action only on particularity grounds; specifying the issues that Plaintiffs needed to address; and taking care to note that corresponding amendments would likely not be futile. *See, e.g.*, DB Order, at *7. ***First,*** the Court instructed Plaintiffs to specify the alleged misstatements for each Offering, including where the misstatements were located in the preliminary materials

---

[1] Unless otherwise indicated, all emphasis has been added, and all citations and quotations in cases have been omitted.

that were relied upon by TIAA and FSAM. DB Order, at *12-14. The Complaints contain lengthy exhibits setting forth the specific misstatements alleged to be false, the date those statements were made, and the source and page number within that source where those misstatements are located. ***Second,*** the Court instructed Plaintiffs to allege the dates upon which TIAA and FSAM purchased the securities. DB Order, at *15. Exhibits A to the Complaints contain the order and settle dates for each Certificate. ***Third,*** the Court instructed Plaintiffs to specify the particular defendants and securitizations to which the Complaints refer. The Complaints do just that. ***Last,*** the Court cautioned Plaintiffs not to rely on unproven allegations in unresolved cases.  The Complaints do not rely on such allegations.

Defendants' motion largely ignores the DB Order, the bulk of Plaintiffs' allegations demonstrating Deutsche Bank's underlying fraud, and the numerous RMBS fraud cases that have sustained virtually identical allegations, including against Deutsche Bank. Instead, Defendants cherry pick and attempt to argue in isolation about specific allegations, ignoring how all of the allegations fit together as a whole to tell a shameful story of how Deutsche Bank intentionally misled investors about the quality of the RMBS it structured and sold. Defendants' effort to slice and dice the Complaints to create the illusion of insufficiencies relies almost entirely on testimony and other evidence put forward in Dexia's case against JPMorgan. Of course, in so doing, Deutsche Bank effectively concedes that TIAA's case is adequately pled. With respect to Dexia, not only are Defendants' arguments completely divorced from Dexia's allegations, they have also been repeatedly rejected by this and other Courts.

The majority of Defendants' brief is devoted to an effort to disprove FSAM's reliance allegations by using snippets of extrinsic evidence from the JPMorgan record. This effort fails. Dexia's allegations are entirely consistent with the evidence put forward in JPMorgan. More

importantly, consistent with numerous recent RMBS fraud decisions, this Court has sustained substantially similar reliance allegations pled by the Dexia Plaintiffs. *See* JPM Order, at *8.

Defendants similarly attempt to use JPMorgan evidence to disprove Dexia's standing allegations. But, again, the Court has twice rejected the argument that such allegations are a basis for dismissal. *See id.*; ECF No. 49, at 2. Defendants transparently attempt to distinguish the situation at hand by pointing to a purportedly new "operative document." DB 30. However, Defendants' prior arguments were almost entirely based upon the relevant language in the Put Contract, which is not only publicly available, but was attached as an exhibit to their supplemental standing brief. *See* ECF No. 46, Appendix A. To the extent that Defendants now attempt to rely on the JPMorgan summary judgment order, this fails for three reasons. First, that order has since been vacated. Second, this is the pleading stage, and the Court has twice rejected the same standing argument raised by Defendants, after consideration of the same "operative document." Third, to the extent that there is any doubt regarding the parties' intent to transfer the fraud claims with the assignment, the parties' Ratification and Dexia's supplemental allegations confirm that intent. *See* Wales Ex. A.

Deutsche Bank spends the remainder of its brief in an effort to recycle its "hodgepodge" argument from the first round of motion to dismiss briefing. However, this argument gains no traction now that the Complaints have been amended consistent with the Court's guidance regarding compliance with Rule 9(b). Defendants' motion to dismiss should therefore be denied.

## STATEMENT OF FACTS

### I.   Deutsche Bank's Securitization Machine

Through several wholly-owned, affiliated entities, Deutsche Bank created a vertically-integrated enterprise for the creation and sale of MBS. TIAA ¶¶45-48; Dexia ¶¶52-55. Whether as sponsor, depositor, originator, trustee, and/or underwriter (and a financier of other loan

sellers), it obtained *exclusive* access to key information about the quality of the mortgages that it securitized. *Id*. As the "ultimate parent," DBAG directed the management and policies of the other Defendants, including the faulty practices of the originators whose loans were included in the DB RMBS. TIAA ¶¶19, 71; Dexia ¶¶26, 78. As underwriter, DBSI performed due diligence on the underlying loans, worked closely with DBSP in structuring the transaction, reviewed and prepared the Offering Materials, and sold the RMBS. TIAA ¶¶26-32; Dexia ¶¶33-39.

DBSI distributed the FWPs, term sheets, and other computational materials to TIAA and FSAM prior to their purchases of the DB RMBS. TIAA ¶32; Dexia ¶39. TIAA and FSAM reviewed these materials, and performed analyses on the data provided, including "stress tests." TIAA ¶255; Dexia ¶¶306-07. After these analyses were completed, TIAA and FSAM placed an order for RMBS. TIAA ¶256, Dexia ¶308. Consistent with federal regulations, they always understood that the earlier materials upon which they relied differed in no material way from the final ProSupps DBSI circulated after the sale became effective. TIAA ¶¶256-57; Dexia ¶309.

The Offering Materials misrepresented to TIAA and FSAM:

- that the loans complied with underwriting guidelines which were intended to assess the borrowers' ability to repay; that exceptions would be made on a case by case basis only when compensating factors existed; and in specified instances, that the loans were "re-underwritten" by DBSP (TIAA ¶134 & Ex. B; Dexia ¶142 & Ex. B);

- that appraisals of underlying properties that secured the loans conformed to established industry standards, and that stated LTV and CLTV ratios for the loan pools underlying each RMBS were true and correct (TIAA ¶134 & Ex. C; Dexia ¶142 & Ex. C);

- the risk of default, including the borrowers' credit scores, the number of homes that were actually occupied by their owners, and that the underlying loans adhered to stated borrower DTI limits (TIAA ¶134 & Exs. D-E; Dexia ¶142 & Exs. D-E);

- that title for the underlying loans would be properly transferred and assigned to the trust (TIAA ¶134 & Ex. F; Dexia ¶142 & Ex. F); and

- that the credit ratings for the Certificates accurately reflected the Certificates' risk

4

(TIAA ¶134 & Ex. G; Dexia ¶142 & Ex. G).

**II.      The Undisclosed Truth About Deutsche Bank's Securitizations And Due Diligence**

Unbeknownst to TIAA and FSAM, in pursuit of profits from new issue fees, Deutsche Bank's securitization machine had abandoned due diligence in favor of quickly pushing loans through its securitization process, irrespective of loan quality.  For example, Clayton and Joseph Swartz, DBSI's President of Due Diligence both testified before the FCIC that Deutsche Bank *knowingly* securitized huge numbers of loans that Clayton expressly flagged as defective.  TIAA ¶¶64-67; Dexia ¶¶71-74.  Clayton would conduct due diligence on a sample of loans in a given mortgage pool before Deutsche Bank purchased and securitized the pool, and rate each loan on a 1 to 3 scale to reflect the loan's creditworthiness (with 1 being the best). TIAA ¶64; Dexia ¶71. During 2006-07 when all but one of Plaintiffs' RMBS were purchased, *over one-third (36%) of the Deutsche Bank-securitized loans it sampled were given the worst grade of 3* – meaning that those loans suffered from "egregious" violations of loan underwriting guidelines, contained no compensating factors, and were backed by patently inadequate collateral.  TIAA ¶66; Dexia ¶73.

Clayton's findings were reflected in reports distributed to Swartz and shared with Deutsche Bank senior management for every loan pool that Clayton reviewed for Deutsche Bank.  TIAA ¶¶74-77; Dexia ¶¶82-85.  Nonetheless, Deutsche Bank *"waived in" 50%* of these bad loans from the Clayton samples to securitizations that it sold to investors, such as TIAA and FSAM.  TIAA ¶66; Dexia ¶73.[2]  And even though it *knew* from the sampling procedure that 36% of the loans were "egregiously" defective, TIAA ¶64 & Dexia ¶73 (quoting Swartz), Deutsche Bank simply purchased and securitized the entire loan pool. TIAA ¶67; Dexia ¶74.

Deutsche Bank also used other methods to push defective loans into securitizations.  For

---

[2] Defendants also ignored Lydian's findings which revealed loan "deficiencies" so "blatant," CW1 "couldn't believe they could be approved."  TIAA ¶79; Dexia ¶87.

example, senior management at Deutsche Bank rejected efforts to put any kind of compliance framework into place at Deutsche Bank's wholly-owned mortgage-origination subsidiary, MortgageIT.  TIAA ¶¶87-88; Dexia ¶¶95-96.  Deutsche Bank also extended billions of dollars in "warehouse" lines of credit to some of the most infamous lenders in the industry, such as New Century and American Home, to finance their origination of new loans, which were then sold back to DBSP.   TIAA ¶¶99, 101; Dexia ¶¶107, 109. Unbeknownst to investors, these relationships forced DBSP to buy whatever loans these originators generated, regardless of quality, or else risk that the originators would default on their Deutsche Bank credit lines.  TIAA ¶¶103-04; Dexia ¶¶111-12.  DBAG and DBSP even created a "correspondent lending program," ran by DBSI, through which DBSP provided guarantees to some of the worst "fly by night" lenders in the subprime market (whose identities were not disclosed to investors) that it would purchase their loans before they were even originated.  TIAA ¶105; Dexia ¶113.

Deutsche Bank also knowingly violated its own underwriting policies.  For example, Deutsche Bank had determined that ARM borrowers with DTI ratios above 50-55% could not be expected to repay their loans, and therefore represented to investors that it would reject loans with DTI ratios that exceeded this level.  TIAA ¶82 & Ex. D; Dexia ¶90 & Ex. D.  However, in calculating DTI ratios, contrary to federal guidance, Deutsche Bank only used the *teaser* mortgage interest rates – initially low rates that lasted for only 2-3 years. TIAA ¶¶83-85; Dexia ¶¶91-93.   As Deutsche Bank well knew, the use of these teaser rates to calculate DTI dramatically understated the true DTI of the borrowers whose loans backed its RMBS.  Indeed, in the "strictly confidential" Shorting Report, Deutsche Bank *recalculated* DTIs using the correct, full rate, and compared them to DTIs based on the teaser rates, concluding that a majority of borrowers had DTIs well in excess of the supposed 50-55% limit.  TIAA ¶84; Dexia

6

¶92.   Similarly, Deutsche Bank violated its own stated policy that none of the LTVs of the underlying loans would exceed 100% by routinely securitizing loans that far exceeded this threshold, due in part to "inflated appraisals" which DBSI employee Eugene Xu testified Defendants knew was "fraud."  *E.g.*, TIAA ¶9; Dexia ¶148.

Perversely, led by Greg Lippmann, Managing Director at DBSI and Deutsche Bank's global head of RMBS, ABS and CDO Trading (who supervised RMBS traders), Defendants devised a scheme to profit from toxic loans they were securitizing.  TIAA ¶¶113-14; Dexia ¶¶120-21.  They bet against a series of RMBS, including RMBS purchased by FSAM, that were destined to fail through what Lippmann dubbed Deutsche Bank's "ponzi scheme."  TIAA ¶113; Dexia ¶120.  Kept on a "tight leash" by DBAG senior management, and compensated more highly in 2006 than the rest of Deutsche Bank's senior management combined, Lippmann led Defendants to amass a short position of ***over $10 billion*** in 2007. TIAA ¶¶117-25; Dexia ¶¶124-33.  Specifically, Lippmann analyzed the originators of the Certificates, the ACE and DBALT shelves purchased by TIAA and FSAM, and some of the Dexia RMBS at issue, and concluded that they were ***"bad," "pigs," "like the plague," "pieces o crap,"*** and ***"this stinks, though I didn't mention it."*** *E.g.*, TIAA ¶¶118, 122-23; Dexia ¶¶130-31, 138. Lippmann's views were so widely held by Deutsche Bank traders that they were parodied in a song.  TIAA ¶126 n. 20; Dexia ¶134 n. 20. None of this was disclosed to Plaintiffs. *See, e.g.*, TIAA ¶129, Dexia ¶137 (Lippmann to a favored client: "***please please do not forward these emails outside of your firm….I do not want to be blamed by the new issue people for destroying their business***").

## III.   Deutsche Bank Conceals Material Information From The Ratings Agencies

Defendants sought the highest possible "investment grade" ratings from the CRAs by withholding inside information about the Certificates' true quality and providing them with false information. TIAA ¶¶230-31; Dexia ¶¶281-82. Defendants also secretly manipulated and bullied

the CRAs into awarding high ratings. TIAA ¶¶238-51; Dexia ¶¶289-302.

## IV.   <u>The RMBS Are Downgraded To Junk</u>

Almost all of the Certificates carried an initial rating of AAA/Aaa. TIAA ¶253; Dexia ¶304.  However, as of three years after issuance, ***over 22%*** of the principal balance of the loans backing the TIAA RMBS, and as of May 2011, ***over 40%*** of the principal balance of the loans backing the Dexia RMBS, had defaulted, were in foreclosure, or were seriously delinquent – and all but one of the Certificates have been downgraded to "junk." TIAA ¶15; Dexia ¶15.[3] Plaintiffs recently conducted a forensic loan-level analysis of a sample of the loans comprising the DB RMBS which confirmed that the Offering Materials overstated the value of the collateral, misrepresented owner occupancy rates, and that a substantial number of the mortgage documents were never properly transferred to the securitization trusts. TIAA ¶¶199-229; Dexia ¶¶250-80.[4]

## ARGUMENT

On a motion to dismiss, the Court must accept all factual allegations as true, and draw all reasonable inferences in the plaintiff's favor.  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F. 3d 87, 98 (2d Cir. 2007).  Rule 8(a) requires "factual allegations sufficient to raise a right to relief above the speculative level," as shown by "any set of facts consistent with the allegations in the complaint."  Fraud claims must also satisfy Rule 9(b), which requires a plaintiff to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were

---

[3] The pools consist of loans that are current, 30-90 days late, in bankruptcy, REO, or foreclosure.

[4] TIAA's and Dexia's samples each consisted of the greater of 10% of the loans in each supporting loan group, or 250 loans, for a total of 4,179 and 6,947 loans, respectively. TIAA ¶199; Dexia ¶250. This analysis included: (a) using an AVM to calculate the value of the property underlying the loan at the time of origination, TIAA ¶203, Dexia ¶254; (b) running tests to determine whether borrowers occupied the homes securing the mortgages, TIAA ¶213, Dexia ¶264; and (c) consulting public records to assess whether the chain of assignments for each loan was complete, TIAA ¶227, Dexia ¶278.  This analysis was not available in 2007.

fraudulent." *Id.* at 99; *see also* JPM Order, at *4 (same). Where, as here, defendants are affiliates participating in a securities offering, "reference to an offering memorandum satisfies [Rule 9(b)]." *See Ouaknine v. MacFarlane*, 897 F.2d 75, 80 (2d Cir. 1990); *see also* JPM Order, at *4.

**I.      Plaintiffs Have Stated A Claim For Fraud And Fraudulent Inducement**

Fraud requires allegations of "a representation of fact, which is either untrue and known to be untrue or recklessly made, and which is offered to deceive the other party and to induce them to act upon it, causing injury." *Jo Ann Homes at Bellmore v. Dworetz*, 250 N.E. 2d 214, 217 (N.Y. 1969). Here, the Complaints plead each element with particularity. Indeed, numerous courts have sustained substantially identical allegations, and rejected the arguments advanced by Defendants. *See, e.g.*, *FHFA v. Deutsche Bank AG*, 2012 WL 5471864, at *2 (S.D.N.Y. Nov. 12, 2012) ("*FHFA v. DB*"); *Phoenix Light SF Ltd. v. ACE Sec. Corp.*, 39 Misc. 3d 1218(A), at *7 (Sup. Ct. Apr. 24, 2013); *Allstate Ins. Co. v. ACE Sec. Corp.*, Index No. 650431/2011, ECF No. 79 at 24 (Sup. Ct. Mar. 15, 2013) ("*Allstate v. DB*"); *Stichting Pensioenfonds ABP v. ACE Sec. Corp.*, Index No. 652460/2011, Tr.64-65:1-11, 86-88:2-16 ("ACE Tr."); JPM Order; *Allstate Ins. Co. v. Countrywide Fin. Corp.*, 824 F.Supp.2d 1164, 1184 (C.D. Cal. 2011) ("*Allstate v. CW*").

**A.      The Complaints Adequately Plead Actual, Justifiable Reliance**

The Complaints detail TIAA's and FSAM's investment processes, alleging that they received, reviewed, and actually relied upon specified false statements in the Offering Materials, including FWPs, term sheets, and other computational materials before making each investment decision. TIAA ¶¶254-58; Dexia ¶¶306-10. Defendants ignore these allegations.

Plaintiffs further allege that, consistent with federal guidance, the ProSupps DBSI sent to TIAA and FSAM at the close of each securitization incorporated and confirmed the information provided to them in the earlier Offering Materials. *See* TIAA ¶256-57, Dexia ¶309. Defendants again ignore these allegations, misconstruing the references to ProSupps in the Complaints.

In addition, the Complaints detail how TIAA and FSAM had no access to the underlying loan files, and therefore no means of independently verifying the information supplied to them by DBSI.  TIAA ¶¶32, 52, 258; Dexia ¶¶39, 59, 310.  Indeed, TIAA and FSAM could not know that Defendants' own internal analyses and due diligence identified significant problems with the underlying loans, leading them to secretly conclude that the vast majority of those loans were defective; or that Deutsche Bank provided false information to and otherwise manipulated the CRAs in order to secure false ratings. TIAA ¶¶52, 63-85, 232-51; Dexia ¶¶59, 70-106, 283-302.

These allegations adequately allege that TIAA and FSAM actually and justifiably relied on Defendants' representations.  *See, e.g.*, JPM Order, at *8 (similar FSAM reliance allegations sustained); *FHFA v. DB*, at *2-3 (similar allegations of reliance on preliminary materials which contained information later incorporated into ProSupps adequate).[5]

Defendants ask the Court to completely ignore the detailed allegations of the Complaints and their exhibits, and to conclude that Plaintiffs' allegations of actual reliance are inadequate. DB 9-14.  This effort should be rejected.

The DB Order directed Plaintiffs to "identify any specific misstatements in the [FWPs]" and other Offering Materials relied upon by TIAA and FSAM in order to satisfy Rule 9(b).  *See*

---

[5] *See also Allstate v. CW*, at 1187 (allegations "that [plaintiff] 'received, reviewed, and relied upon the Offering Materials'" sufficient); *Abu Dhabi Commerc'l Bank v. Morgan Stanley & Co., Inc.*, 651 F. Supp. 2d 155, 181 (S.D.N.Y. 2009) (allegations that plaintiffs relied upon credit ratings sufficient).  Defendants' cited cases are inapt.  *Turtur v. Rothschild Registry Int'l, Inc.*, 1993 WL 338205 (S.D.N.Y. August 27, 1993) says nothing of Rule 9(b), but granted summary judgment to defendants where plaintiff received the offering materials from a third party that did not rely on them. In *Gabriel Capital, L.P. v. NatWest Fin. Inc.*, 177 F. Supp. 2d 169 (S.D.N.Y. 2001), the Court denied summary judgment with respect to misstatements made during roadshows plaintiff attended before making its investment decision.  In *Sec. Investor Prot. Corp. v. BDO Seidman*, 95 N.Y.2d 702, 709 (2001) and *Singer Co. v. Stott & Davis Motor Express, Inc.*, 79 A.D.2d 227, 233 (4th Dep't 1981), it was undisputed that the plaintiffs did not receive the misrepresentations before investing. In *Devaney v. Chester*, 709 F. Supp. 1255, 1264 (S.D.N.Y 1989), "reliance [wa]s alleged only in summary form."  *Contra* TIAA ¶¶254-60; Dexia ¶¶305-12.

DB Order, at *6. The Complaints detail how TIAA and FSAM relied upon Defendants' misstatements contained in FWPs, term sheets, other computational materials, and shelf documents, and identify those misstatements in accompanying exhibits. TIAA ¶¶254-58, Exs. B-G; Dexia ¶¶306-10, Exs. B-G. Plaintiffs also specifically allege that "[t]he data provided to [TIAA and FSAM] by defendant DBSI in the earlier materials…was virtually identical to and incorporated into the final [ProSupps] that were filed with the SEC." TIAA ¶257, Exs. B-G; Dexia ¶309, Exs. B-G.  Had TIAA or FSAM "known [the material facts alleged]," they "would not have purchased the RMBS."  TIAA ¶254; Dexia ¶305.  As noted above, these allegations are more than sufficient to satisfy Rule 9(b), and the antithesis of a claim that "the market was misled."  DB 13.

Deutsche Bank's challenges to Plaintiffs' allegations of actual reliance rest on several entirely unsupportable premises.  Deutsche Bank first asks the Court to disregard, and thereby effectively strike the detailed catalog of material misrepresentations in the exhibits to the Complaints, and to conclude that Plaintiffs have not identified any misstatements. DB 10. This is baseless, as the exhibits are part of the Complaints. Indeed, this Court, along with numerous others, has credited such misstatements in RMBS fraud cases.  *See, e.g.*, JPM Order.

Deutsche Bank next contends that the Complaints do not allege that TIAA and FSAM ever "read" Defendants' alleged misstatements, DB 13, while ignoring the allegations that TIAA and FSAM "reviewed" and "analyzed" them.  *See* TIAA ¶255 & Dexia ¶¶307-08.  For purposes of alleging reliance, there is no material distinction between "reading" a misrepresentation and "reviewing" and "analyzing" a misrepresentation.[6] Deutsche Bank similarly asserts that because

---

[6]  *Compare* Black's Law Dictionary ("review," defined as "consideration, inspection, or reexamination of a subject or thing") *with* Merriam-Webster Dictionary ("read," defined as "to receive or take in the sense of (as letters or symbols) especially by sight or touch"); *see also*

the Complaints used "the word 'typically'" when describing TIAA's and FSAM's investment processes, "plaintiffs admit that they did not *always* review the types of documents they cite." DB 13 (emphasis in original). This is not accurate. Rather, the Complaints describe TIAA's and FSAM's investment processes for all of the Certificates, TIAA ¶255, Dexia ¶¶306-08, and then in Exhibits B-G, Plaintiffs specify the *exact* statements reviewed, analyzed and relied upon.[7]

Notably, Defendants do not otherwise challenge Plaintiffs' ability to allege reliance based on misstatements in FWPs, term sheets and other computational materials. Defendants' remaining actual reliance arguments focus (ineffectively) on only a subset of Offerings and only on misstatements made in base prospectuses and ProSupps.

Defendants ask the Court to disregard the misstatements contained in the "form prospectuses attached to registration statements" of 7 RMBS because those misstatements were "stale" by the time of purchase. *See* DB 16-17 & n.19.[8] However, in rejecting the same argument, Judge Cote recently explained that because federal law requires "[FWPs] to [direct] the recipient to the registration statement and base prospectus on file with the SEC, 17 C.F.R. § 230.433," Defendants cannot disavow those statements as simply being outdated. *See FHFA v. Bank of Am. Corp.*, 2012 WL 6592251, at *4 (S.D.N.Y. Dec. 18, 2012); *see also FHFA v. DB*, at *3 (same). Each FWP upon which the Complaints allege TIAA and FSAM relied contained this specific directive. *See* Wales Exs. E, F. Accordingly, Defendants' attempt to evade liability for

---

*Allstate v. CW*, at 1187 (allegations that plaintiffs "'received, reviewed, and relied upon the Offering Materials'" sufficient to plead actual reliance).

[7] Defendants' cited cases, DB 14 & n.14, are readily distinguishable. In *Granite Partners, L.P. v. Bear, Stearns & Co.*, 58 F. Supp. 2d 228 (S.D.N.Y. 1999), plaintiff merely pled reliance on "information and belief." In *Am. Fin. Int'l Grp.-Asia, L.L.C. v. Bennett*, 2007 WL 1732427 (S.D.N.Y. June 14, 2007), plaintiffs failed to allege ever receiving or reading defendants' alleged misrepresentations. Similarly, in *Small v. Lorillard Tobacco Co.*, 252 A.D. 2d 1 (1st Dep't 1998), no facts were pled to support the inference that plaintiff read the timely misstatements.

[8] Defendants' contention at DB n. 20 that "the form ProSupps contain blanks for the information that plaintiffs allege they 'typically' read" is as vague as it is inaccurate. *See* Wales Exs. C, D.

misstatements contained in documents to which FWPs directed investors should be rejected as flatly contrary to the SEC rules and the plain language of the documents themselves. Tellingly, Defendants also never claim that the "updated" materials and data contained statements that were different from the earlier form prospectuses and registration statements upon which TIAA and FSAM allege that they also relied.[9] Deutsche Bank's argument is also significantly undercut by its assertions elsewhere in its brief that disclosures in base prospectuses negate Defendants' liability here.  *See, e.g.*, DB n. 22.[10]

Finally, Deutsche Bank argues that Plaintiffs may not allege reliance on misrepresentations in the ProSupps because in 28 out of 32 instances, the ProSupps post-date TIAA's and FSAM's purchases. DB 10-12. This argument misstates once again the allegations of the Complaints. As alleged, the final ProSupps were important to TIAA and FSAM because under Regulation AB, when a ProSupp contains new corrective information, banks must give investors the right to rescind. *See* Rule 159; Dexia ¶¶308-09; TIAA ¶¶256-57. The ProSupps therefore **_confirmed_** the false statements in the earlier materials on which TIAA and FSAM relied, and TIAA and FSAM "always understood [] that the earlier materials contained information that was **_virtually identical_** to the information in the final materials." *Id.*[11]

---

[9] Defendants' failure to disclose that the underwriting guidelines were systematically abandoned is also an actionable omission.  *See, e.g.*, *St. John's Univ., N.Y. v. Bolton*, 757 F. Supp. 2d 144, 175 (E.D.N.Y. 2010). By providing the earlier data, Defendants assumed the obligation to speak truthfully about it and disclose the violations which rendered the data unreliable. *See Schwartz v. ThinkStrategy Cap. Mgmt. LLC*, 2012 WL 2026365, at *14 (S.D.N.Y. May 31, 2012).

[10] At most, whether such information was "stale" at the time of purchase is inappropriate for determination on the pleadings. *See, e.g.*, *In re JWP Inc. Sec. Litig.*, 928 F. Supp. 1239, 1270 (S.D.N.Y. 1996) (question of fact as to whether year old "certificates were stale" at time of purchase). In *Premier-N.Y., Inc. v. Travelers Prop. Cas. Corp.*, 867 N.Y.S.2d 20 (table), 2008 WL 2676800, at * 7 (Sup. Ct. June 8, 2008), DB 17, the relevant contract stated that plaintiff was responsible for taking specific steps to verify whether defendants' representations were accurate.

[11] In adopting Regulation AB, the SEC determined that it would be "inappropriate" for marketing materials to disclaim liability for the information contained therein because a final

Defendants address these allegations only in a footnote, where they assert that "plaintiffs nowhere allege that they read the ProSupps before the settlement date and decided not to rescind in reliance on the ProSupps." DB n.9. This argument misses the point and ignores reality. Had Deutsche Bank not proactively informed TIAA and FSAM of a material change to the final ProSupps, it would have been liable under section 12(a)(2) for the statements in the earlier materials. *See* Rule 159. Moreover, if the originators were systematically abandoning the underwriting guidelines, then the data in the earlier materials upon which Defendants concede TIAA and FSAM relied would not make sense. Put another way, the characteristics of the underlying RMBS collateral were all a product of the origination process. If the underwriting guidelines were not being followed, then these data points could not be reliable.

Defendants impermissibly rely on JPMorgan testimony[12] to support their fact-based argument that FSAM did not review the ProSupps prior to purchase. DB 11-13. As such, this argument does not apply to TIAA. It also does not apply to the 4 Certificates that FSAM did not purchase before the final ProSupps were issued. *See* Dexia Ex. A. With respect to the remaining Certificates, Deutsche Bank's selected testimony from the JPMorgan case changes neither what Dexia pled, nor the veracity of those allegations. As Defendants are forced to concede, the Complaints do not allege that FSAM read ProSupps – as opposed to the earlier Offering

---

prospectus would be delivered after the investors' trade decisions. Asset Backed Securities, 70 Fed. Reg. 1506-01, 1557 (Jan. 7, 2005). The SEC further specified that pre-trade marketing materials are considered prospectuses and "remain subject to the general anti-fraud provisions of the Securities Act and Exchange Act." SEC Release No. 33-8591, Securities Offering Reform at 1558, n. 410. Necessarily, such material is also subject to common-law fraud claims.

[12] *See, e.g.*, *Taylor v. VT Dep't of Educ.*, 313 F.3d 768, 776 (2d Cir. 2002) (on a Rule 12(b)(6) motion, "the district court is generally limited to the facts presented within the four corners of the complaint, to documents attached to the complaint, or to documents incorporated within the complaint by reference"). In *Global Network*, 458 F.3d 150 (2d Cir. 2006), DB 12, the district court erred in dismissing the complaint because it considered matters outside of it, including ***testimony "which was not mentioned or relied upon by plaintiff in drafting the complaint*."

Materials – prior to placing an order for any of the Certificates at issue here.  DB 10.[13]

Deutsche Bank's assertion that TIAA and FSAM cannot establish that their reliance was reasonable because they are too "sophisticated" likewise fails.  New York courts agree that "even a sophisticated party may rely on the representations of another where the facts misrepresented were 'peculiarly within Defendants' knowledge.'"  JPM Order, at *8; *see also Allstate v. DB*, at 22.  The Complaints allege that TIAA and FSAM could not have accessed the loan files, TIAA ¶32, Dexia ¶39; Defendants' internal due diligence reports, TIAA ¶57, Dexia ¶64; or information about Deutsche Bank's manipulation of the CRAs, TIAA ¶¶249, 254, Dexia ¶¶300, 305; and as such, they had to rely on Deutsche Bank. *See, e.g.*, JPM Order, at *8 ("given the information regarding the individual loans that defendants possessed and that plaintiffs could not have obtained, no outside information could have led [FSAM] to discover defendants' fraudulent practices."); *Chase*, 2012 WL 5395646, at *16 (in such circumstances, plaintiffs "could [not] help but rely on the representations of defendants"); *Allstate v. DB*, at 27 (same, distinguishing *HSH Nordbank AG v. UBS AG*, 95 A.D.3d 185 (1st Dep't 2012), cited at DB 28).[14]

Defendants point to two sources of information that they claim render TIAA's and FSAM's reliance unjustifiable, *i.e.*, "so utterly unreasonable, foolish, or knowingly blind as to

---

[13] Nor do Defendants' selected excerpts tell the whole story.  The JPMorgan testimony is entirely consistent with Dexia's allegations that prior to purchase, FSAM reviewed "term sheets," "marketing materials," and "all publicly-available information," and always understood that the earlier materials would not differ materially from the ProSupps.  *See* Pls.' Resp. to Defs.' R. 56.1 Statem't, *Dexia SA/NV v. Bear, Stearns & Co., Inc.*, No. 12-cv-04761, ECF No. 40, at 113-16.

[14] *See also King Cnty. Wash. v. IKB Deutsche Industriebank AG*, 751 F. Supp. 2d 652, 661 (S.D.N.Y. 2010) ("plaintiffs have alleged a great deal of such peculiarly-held knowledge on [defendants'] part," including how "the ratings process was flawed and…the [CRAs] could not issue objective ratings"); *ACE* Tr. at 63:11-15 (no amount of diligence would have uncovered Deutsche Bank's "internal decision" to systematically disregard underwriting and appraisal standards). With respect to FSAM's supposed insider knowledge, DB 4-5 & n.5, information barrier procedures were implemented between FSAM and FSAI which prohibited FSAI from sharing non-public information with FSAM personnel who made investment decisions.

15

compel the conclusion that whatever injury [they] suffered was [their] own responsibility." JPM Order, at *8. First, Deutsche Bank cites a Dexia press release – which it concedes was issued *after* FSAM purchased *nearly 80%* of the Dexia Certificates – which mentions "problems" and general "poor performance" of subprime loans, as well as "weak underwriting." DB 25. Putting aside the fact that this argument improperly relies entirely on material outside of the pleadings, *see Chase*, 2012 WL 5395646, at n.17, knowledge regarding "subprime loans" and "dubious underwriting practices by originators" is not enough to render reliance unreasonable as a matter of law because "even in the face of [this information], [plaintiffs] were entitled to rely on defendants' assertion that the loans that underlay *these particular securities* complied with the guidelines set out in the offering materials." *See id.* at *16.[15] Similarly, a statement made by a TIAA executive *after* TIAA purchased *half* of the Certificates about the possible "economic distress" that could occur "[i]f the housing market became extremely distressed," DB 25, does not show that TIAA knew about problems with the Certificates, let alone fraud. *See id.*

Second, Deutsche Bank cites risk disclosures in 8 ProSupps that contain general warnings about increased "delinquencies and losses with respect to residential mortgage loans"; "difficulties" with "mortgage originators"; the existence of "market risk"; and increased risks associated with "certain types of Underlying Loans." DB 26. Again, none of these disclaimers warned TIAA or FSAM of the systematic problems alleged, or that Defendants knowingly misrepresented loan quality. *See Chase*, 2012 WL 5395646, at *17; *Allstate Ins. Co. v. Morgan*

---

[15] *See also Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.*, 2011 WL 135821, at *9 (S.D.N.Y. Jan. 12, 2011) (public documents "generally related to the weakening and outright disregard for underwriting guidelines by subprime originators" but not to the conduct of the RMBS issuers insufficient to provide notice of falsity); *FHFA v. UBS Americas, Inc.*, 858 F. Supp. 2d 306, 321 (S.D.N.Y. 2012) (same); *Allstate v. MS*, at 15-18 (same). The types of reports listed at DB n.33, also did not put TIAA or FSAM on notice of falsity, or fraud. *See id.* Nor could TIAA or FSAM have learned of Deutsche Bank's scienter from the loan tapes. *See id.*

*Stanley*, Index No. 651840/11 (1st Dep't 2013), at 15-18 ("*Allstate v. MS*").[16]  In any event, what

TIAA or FSAM knew or should have known raises factual issues that cannot be decided on the

pleadings. *See, e.g.*, *CIFG v. Goldman, Sachs & Co.*, 2013 WL 1876243 (1st Dep't May 7, 2013)

(refusing to decide reasonable reliance on the pleadings even where plaintiff did have access to

the loan files); *see also Allstate v. CW*, at 1187.  In sum, justifiable reliance is well-pled.

### B. The Complaints Adequately Allege Material Misstatements And Omissions

#### 1. Defendants Misrepresented Loan Underwriting And Selection

The Offering Materials assured investors that the loans complied with stated underwriting

guidelines, which were primarily intended to assess the borrowers' ability to repay. TIAA ¶134

& Ex. B; Dexia ¶142 & Ex. B.  Exceptions would be made on a "case by case basis" only where

"compensating factors existed."  *Id.*  For all of the Offerings, Deutsche Bank represented that the

originators conducted due diligence to verify that the loans complied with the underwriting

guidelines, *id.*, and for 10 of Dexia's Offerings, Deutsche Bank further represented that

defendant DBSP and/or Deutsche Bank's originator-affiliates conducted their ***own review*** to

verify loan compliance. Dexia ¶68 & Ex. B. In actuality, as the Complaints detail, Defendants

systematically securitized loans on a massive scale that were ***in violation*** of the stated

underwriting guidelines, despite the adverse results of due diligence.  *See, e.g.*, TIAA ¶¶60-132;

Dexia ¶¶67-140.

Deutsche Bank asserts that its statements regarding underwriting were not false because

the preliminary materials for 1 of TIAA's RMBS and 3 of Dexia's RMBS stated that "the loans

would only 'generally' conform to guidelines."  DB 16 & n.18.  However, the "alleged repeated

---

[16]  Similarly, the delinquency reports cited by Defendants to support their contention that
FSAM's reliance on the Offering Documents for ACE 2007-WM2 was unjustifiable because it
was purchased on the secondary market, DB 26, would have showed, at most, that some of the
underlying loans had started to perform poorly.  *See, e.g.*, *N.J. Carpenters H'lth Fund v. Res.
Capital, LLC*, 2011 WL 2020260, at *5 (S.D.N.Y. May 19, 2011).

deviation from established underwriting standards is enough to render [this statement] misleading." *Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.*, 714 F. Supp. 2d 475, 483 (S.D.N.Y. 2010); *see* JPM Order, at *4 (same).[17]   Similarly, disclosures in preliminary materials for 5 RMBS which stated that "substantial" or "significant" numbers of loans did not comply with the guidelines, DB 16, "do not disclose the risk of a systematic disregard for underwriting standards or an effort to maximize loan originations without regard to loan quality." *In re Morgan Stanley Pass-Through*, 810 F. Supp. 2d 650, 672 (S.D.N.Y. 2011).[18]

Faced with dozens of RMBS cases that have sustained the same fraudulent statements alleged by Plaintiffs here, Deutsche Bank tries to confuse the record by suggesting that the Complaints do not allege underwriting guideline misstatements for every Offering. DB 14. As Exhibits B to the Complaints demonstrate on their face, this is not true. *See* Wales Exs. C, D.

Indeed, the only specific example that Deutsche Bank proffers to support this mischaracterization is the argument that the Offering Materials for 4 Dexia RMBS do not expressly state that the loans "conformed to the underwriting guidelines."   DB 15.   While Defendants are correct that these exact words do not appear, no reasonable investor could read the statements that are contained in these Offering Materials and reach any other conclusion. *See, e.g.*, Dexia Ex. B at 37 (DBALT 2006-AR4: "Countrywide Home Loans' underwriting standards have been met"); *id.* at 19, 50 (DBALT 2006-AR6 & DBALT 2006-AR3: "exceptions to [published] underwriting guidelines are considered, so long as the borrower has other

---

[17] *See also FHFA v. DB*, at *2 (same); ACE Tr. at 64-65:1-11, 86-88:2-16 (sustaining the same misstatement by Deutsche Bank and rejecting the same disclaimers); *Allstate v. DB*, at 24-25.

[18] *See also, e.g.*, *Plumbers' & Pipefitters' Local No. 562 Suppl. Plan & Trust v. J.P. Morgan Accept. Corp.*, 2012 WL 601448, at *17 (E.D.N.Y. Feb. 23, 2012) (rejecting "significant" exceptions disclaimer); *FHFA v. UBS*, 2012 WL 1570856, at *19-20 (rejecting "substantial" exceptions disclaimer); *Allstate v. DB*, at 23 (same). *Accord Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723 (2d Cir. 1998), cited at DB 16.

reasonable compensating factors, on a case-by-case basis").[19]

Finally, Defendants wrongly argue that for 6 Dexia Offerings and 2 TIAA Offerings, "the Preliminary Materials make underwriting compliance-related representations about Underlying Loans from only *some* of the Originators," and plaintiffs must plead "the proportion of loans that came from each Originator" to establish materiality. DB 15-16 (emphasis in original).  No Court has imposed Deutsche Bank's suggested pleading standard upon an RMBS plaintiff, and the Offering Materials themselves specify the percentage of loans originated by each originator in the Offering.  *See* Wales Exs. G, H.

Moreover, Defendants' argument largely relies on the same erroneous assertion that the Court should ignore pages of misrepresentations regarding guideline compliance and exceptions unless the Offering Materials contain certain magic words. For example, Defendants claim that Dexia only alleges a misstatement pertaining to People's Choice for the ACE 2007-HE2 offering, and that People's Choice only originated 25% of the loans in that offering, so the alleged misstatement is not material.  DB n.17.  In actuality, the ACE 2007-HE2 materials also contain misstatements regarding compliance with CIT's underwriting guidelines, Dexia Ex. B at 142-45, and CIT originated 38.08% of the underlying loans. *See* Wales Exs. G, H.[20]

In any event, even if Defendants had accurately described the misrepresentations in the

---

[19] *See also* Dexia Ex. B. at 137 (ACE 2007-HE3: "On a case by case basis, ResMAE may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting…guidelines described below warrants an…exception"). Even under Defendants' theory, their representations would still be actionable "misleading partial disclosure[s]." *Williams v. Sidley Austin Brown & Wood*, 38 A.D.3d 219, 220 (1st Dep't 2007).

[20] The same is true for many of the Offerings listed at DB n.16.  *See, e.g.*, Dexia Ex. B at 7 (DBALT 2007-AR2: "exceptions to [MortgageIT's] underwriting guidelines are considered, so long as the borrower has other reasonable compensating factors, on a case-by-case basis"); *id.* at 142 (ACE 2007-HE2: same re: CIT's guidelines); *id.* at 26 (DBALT 2006-AR5: same re: GreenPoint's guidelines). The only originators for which the Offering Materials contain no representations originated less than 20% of the loans in the Offerings, and in some instances, did not originate any loans in the loan groups underlying Plaintiffs' RMBS.  *See* Wales Exs. G, H.

Offering Documents, they offer no authority for their assertion that a Court could conclude as a matter of law that a misrepresentation regarding 25% of the loans in an offering is immaterial. Indeed, Regulation AB reflects the SEC's view that 10% of the loans in any given offering is material. *See* 17 C.F.R. § 229.1110.[21]  Defendants' argument thus fails as a matter of law.

2.   Defendants Misrepresented Appraisals And LTVs

Defendants assured investors that appraisals conformed to established industry standards, and that the stated LTV and CLTV ratios for the underlying loan pools were correct. TIAA ¶134 & Ex. C; Dexia ¶142 & Ex. C. In truth, Defendants routinely securitized loans with LTV and CLTV ratios over 100% and sold the resulting RMBS. For example, Defendants ***knew*** but did not disclose that the appraisals were wildly inflated and failed to conform to industry standards; that appraisers were "captive" to the originators, "fearing for their livelihoods" if they failed to inflate their appraisals; and that the true CLTV and LTV ratios would have exceeded 100%. *E.g.*, TIAA ¶¶150, 163 & Ex. C; Dexia ¶¶193, 206 & Ex. C.  DBSI's Eugene Xu testified that Defendants knew of "inflated appraisals" and believed this was "fraud." TIAA ¶8, Dexia ¶148.[22]

Defendants' only response is to attack the AVM model that Plaintiffs used to perform their supporting forensic loan-level analysis. DB 22-23. This effort is misplaced for three reasons. First, putting aside forensic analysis, Deutsche Bank's appraisal misstatements are actionable because Plaintiffs allege "facts which call into question the factual bases" for the

---

[21]In the PSLRA context, a misrepresentation that affects more than 5% of assets is presumptively material. *See, e.g.*, *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 487-88 (2d Cir. 2011).

[22] Defendants also routinely "waived in" large numbers of defective loans, TIAA ¶¶66-68, Dexia ¶¶73-75; conducted due diligence on the underlying loans, TIAA ¶¶63-79, Dexia ¶¶70-87; and had access to the underlying loan files. TIAA ¶52; Dexia ¶59.  Indeed, Plaintiffs plead far more than a discrepancy between their loan-level analysis and Defendants' misrepresentations, DB 23, including testimony from Deutsche Bank employees and CWs from the originators. *E.g.*, TIAA ¶¶87-93, 138-39, 155-58, 171-73; Dexia ¶¶95-101, 159-60, 168-69, 198-201. *Plumbers' Union v. Nomura Acceptance Corp.*, 632 F.3d 762, 774 (1st Cir. 2011), involved a mere allegation "that other banks engaged in such practices…and therefore this may have happened in this case."

appraisals, including that the appraisals were both objectively and subjectively false.  *See* JPM

Order, at *7.[23]  Second, numerous courts have credited the same forensic analysis that Plaintiffs

implemented here in sustaining claims of misstated appraisals and LTVs.  *See, e.g.*, *Prudential*

*Ins. Co. of Am. v. Goldman, Sachs & Co.*, 12 Civ. 6590 (D.N.J. Apr. 9, 2013); *Allstate v. CW*, at

1187; *Allstate Ins. Co. v. Merrill Lynch & Co.*, 650559/2011, at 27 (Sup. Ct. Mar. 15, 2013)

("*Allstate v. Merrill*").  Third, every court to consider the issue has held that such challenges to

the statistical significance of forensic loan-level data, and the validity of plaintiffs' AVM model

are inappropriate at the pleading stage.  *See, e.g.*, *id*.[24] Though irrelevant, Defendants are also

wrong on the merits,[25] and their challenges to Plaintiffs' AVM model should be rejected.

### 3.    Defendants' Actionable Misrepresentations Regarding Credit Ratings

Virtually all of the Certificates were initially rated AAA, denoting the highest credit

quality.  TIAA ¶33; Dexia ¶40. In truth, and unbeknownst to TIAA and FSAM, these ratings

were based on the faulty data detailed above that DBSP and DBSI provided to the CRAs, and

---

[23] *See also Allstate v. DB*, at 25 (sustaining appraisal misrepresentation claims on allegations that
defendants, the appraisers, and the originators knew they were false); *In re Bear, Stearns Mortg.*
*Pass-Through Cert. Litig.*, 851 F. Supp. 2d 746, 769-770 (S.D.N.Y. 2012) (sustaining similar
claims without forensic analysis); *ACE*, Tr. at 89-90 (same); *Allstate v. MS*, at 28 (same).

[24] *See also In re Countrywide Fin. Corp. Mort.-Backed Sec. Litig.*, 2013 WL 1189311 at *7
(C.D. Cal. Mar. 15, 2013); *Bank Hapoalim B.M. v. Bank of Am. Corp.*, 2012 WL 6814194, at *5
(C.D. Cal. Dec. 21, 2012); *Mass. Mut. Life Ins. Co. v. Res. Funding Co., LLC*, 843 F. Supp. 2d
191, 204 (D. Mass 2012).

[25] Plaintiffs' loan sample consists of a random sample of loans within the collateral groups that
support the Certificates, *see* TIAA ¶199 & Dexia ¶250, and no ProSupp disclosed that appraisals
were inflated and defective loans systematically "waived in" to securitizations.  *See, e.g.*, TIAA
¶¶8, 52, 63-79, 150, 163; Dexia ¶¶8, 59, 70-87, 193, 206. Appraisals are a data point that goes
into calculating an LTV/CLTV ratio, and the huge discrepancy between the LTV/CLTVs as
reported and LTV/CLTVs generated by Plaintiffs' model, which relies on data similar to that
used by appraisers, TIAA ¶203 & Dexia ¶254, underscores that the appraisals used by
Defendants were inflated.  Defendants' complaint that Plaintiffs did not allege the AVM's
margin of error also fails because this level of detail is not required at this stage, *see MBIA*, 30
Misc.3d 1201(A), at *4-6, and the CoreLogic White Paper upon which Defendants rely, DB
n.23, does not actually address margins of error.  *See* Klunder Ex. 34, at 2.

Defendants' improper exertion of pressure on the CRAs. TIAA ¶¶232-51; Dexia ¶¶283-302.[26]

All of the Certificates have now been downgraded to junk. TIAA ¶¶33, 253; Dexia ¶¶40, 304.

Defendants do not dispute that the ratings were inaccurate, but rather contend that the ratings are the subjective opinions of the CRAs alone.  DB 19.  Under New York law, however, ratings are not opinion statements.  *See M&T Bank Corp. v. Gemstone CDO VII, Ltd.*, 2009 WL 921381, at *11 (Sup. Ct. Apr. 7, 2009) (rejecting the same argument by DBSI), *aff'd M&T Bank Corp. v. Gemstone CDO VII, Ltd.*, 891 N.Y.S. 2d 578 (4th Dep't 2009).  Moreover, opinions are actionable when not genuinely or reasonably believed, *see Abu Dhabi*, 651 F. Supp. 2d at 176, and it is fraud to **knowingly** cause a false statement to be made, *see Allstate v. CW*, at 1185-86.

Where, as here, Defendants "knowingly fed incomplete or inaccurate information to the [CRAs]…it follows that [Defendants] could not have reasonably believed that the ratings accurately reflected the Certificates' risk." *In re Bear Stearns*, 2012 WL 1076216, at *18 (granting leave to amend).[27]  The Complaint alleges how Defendants (1) **knew** that loan information they gave the CRAs was inaccurate and incomplete, and (2) **knew** that the ratings were a product of their own improper influence over the CRAs. TIAA ¶¶232-51; Dexia ¶¶283-302. New York courts have sustained virtually identical claims on these facts.[28]

In response, Defendants argue only that Plaintiffs' allegations are not sufficiently "specific to the securit[ies] at issue."  DB 18-20.  But the Complaints allege that DBSI and DBSP provided false data to the CRAs, and pressured them to use outdated models, not just in

---

[26] Contrary to Defendants' assertions, DB 18, there is nothing inconsistent about these allegations.  The fact that Deutsche Bank was apparently not able to obtain the ratings it desired using one of these two improper methods does not make its representations any less false.

[27] Unlike in *Bear, Stearns*, the Complaints detail the information provided to the CRAs.  *See* TIAA ¶¶233-37, 248; Dexia ¶¶283-88, 299.

[28] *See, e.g.*, *Credit Suisse*, 2012 WL 6929336, at *10; *ACE*, Tr. 89-90; *M&T Bank*, 891 N.Y.S. 2d at 581.

any one offering, but systematically throughout their entire RMBS securitization program. *See* TIAA ¶¶232-51; Dexia ¶¶283-302. Accordingly, the fact that the documents from Defendants' files cited in the Complaints did not specify which "deal" Deutsche Bank was pressuring Moody's about, or which "June deals were crammed with bad stuff in order to beat the S&P model revisions" is of no moment here. *See* DB 18-19.[29]

4. Defendants' Misrepresentations Regarding the Risk of Default, Including Owner Occupancy Rates, DTIs, and Credit Scores

The Complaints detail how the represented owner-occupancy rates were false, based in part on forensic analysis. TIAA ¶¶208-15; Dexia ¶¶259-66. Defendants wrongly assert that they are not liable for these grossly overstated rates because the ProSupps (documents which Defendants try to discredit elsewhere in their brief) warned investors that the rates were based on representations by others. DB 20. Courts uniformly hold that general disclaimers do not "protect[] a defendant from liability if a statement was knowingly false when made." *In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 556 (S.D.N.Y. 2010); *see, e.g.*, *DLJ Mortg.*, 2010 WL 1473288 (S.D.N.Y. Mar. 29, 2010) (same); *Allstate v. DB*, at 22-23 (same). Here, Plaintiffs allege that Defendants ***knew*** that the occupancy rates were false. TIAA ¶¶212-14; Dexia ¶¶263-65.[30] At best, Defendants misled investors by secretly passing on false information.

With respect to DTIs, Plaintiffs detail how Defendants calculated DTI limits based on the

_____

[29] Defendants' cited authority does not hold otherwise. Neither *Emps. Ret. Sys. of Gov't of Virgin Islands v. Morgan Stanley & Co., Inc.*, 814 F. Supp. 2d 344 (S.D.N.Y. 2011), nor *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 692 F. Supp. 2d 387 (S.D.N.Y. 2010) involved allegations that defendants knowingly provided false information to CRAs as a matter of course.

[30] *See Allstate v. DB*, at 22 (sustaining claims of misrepresented owner occupancy rates); *Allstate v. Merrill*, at 22-23 (same); *ACE*, Tr. at 89-90 (same). In *Footbridge Ltd. v. Countrywide Home Loans, Inc.*, 2010 WL 3790810, at *9 (S.D.N.Y. Sept. 28, 2010), DB 20, "conclusory" allegations "that because [defendant] is a sophisticated loan originator, it was not blindsided and misled by speculators who allegedly lied on their loan applications" were insufficient under the PSLRA. Here, the Complaints detail the basis for Defendants' knowledge that their representations regarding the occupancy rates were false. *See* TIAA ¶212; Dexia ¶263.

initial "teaser" rate rather than the full rate, which they knew would result in artificially low DTI ratios that actually exceeded the stated limit. TIAA ¶¶80-85; Dexia ¶¶88-93. In response, Defendants point to a disclaimer that "the loans would be *originated* based on the borrowers' ability to repay the initial interest rate." DB 21. This language (which is contained in supposedly "stale" prospectuses) does not address the calculation of DTI ratios. *See* Klunder Exs. 27-28. Rather, it concerns the *underwriting* process. *See id.* That a loan may be underwritten based on a teaser rate does not mean that the DTI ratio is calculated using the teaser rate. To the contrary, in such a case, it is critical that investors be given a DTI ratio that reflects the borrowers' actual ability to repay (*i.e.*, calculated using the full rate). Further, the Shorting Report reflects Defendants' *knowledge* that the reported DTI ratios did not disclose the true risk of default. TIAA ¶¶80-85; Dexia ¶¶88-93; *see Allstate v. MS*, at 27 (rejecting the same disclaimers).[31]

Last, the Complaints allege that <u>FICO scores</u> provide a basis for RMBS investors to assess the probability of borrower default, and the credit scores as represented were false. TIAA ¶¶5, 134; Dexia ¶¶5, 142. Defendants wrongly contend that the Complaints lack supporting allegations. DB 21. The Complaints allege that Defendants knew that the originators frequently overrode the underwriters' determinations that a FICO score was too low, and accepted credit scores below the required minimum. TIAA ¶¶101, 139, 145; Dexia ¶¶109, 169, 188, 234. The Complaints further allege that FICO scores are a key indicator of whether borrowers will repay their loans, and the originators systematically disregarded the borrowers' ability to repay. *See* TIAA ¶¶24-25; Dexia ¶¶31-32. Such allegations are more than enough to sustain claims of misstated credit scores. *See* JPM Order, at *6 (sustaining such claims where offering documents

---

[31] Even if the originators' underwriting process was relevant, the Offering Materials contain numerous statements indicating that the underwriters considered whether borrowers would be able to repay their loans under the full rate. *See, e.g.*, Wales Exs. I, J ("the underwriter must ensure that the borrower's income will support the total housing expense *on an ongoing basis*").

did not disclose the actual "risks to purchasers of the certificates"); *see also Phoenix*, 39 Misc.3d 1218(A), at \*6 (sustaining claims of misrepresented credit scores).

### 5.   Deutsche Bank Misrepresented Its Intent to Transfer Title

Plaintiffs allege that Defendants materially misrepresented the transfer of title of the mortgage loans to the issuing trusts, as shown by, *e.g.*, Deutsche Bank Trust's own internal memoranda, as well as Plaintiffs' forensic analysis which shows deficiencies in title transfers so extreme that the only plausible inference is that Defendants never intended to ensure proper title transfer.  TIAA ¶¶222-23, 228 & Ex. F; Dexia ¶¶273-74, 279 & Ex. F.  The Complaints also contain detailed allegations concerning manufactured mortgage documentation, including individuals that were paid $10 an hour to sign someone else's name.  *See* Dexia ¶¶275-77 (describing fraudulent assignments to the ACE 2006-OP1 and DBALT 2006-AR5 trusts); *see also* TIAA ¶¶224-26.  In response, Defendants assert that Plaintiffs do not sufficiently allege that Deutsche Bank had the intent to deceive at the time the misrepresentations were made.  DB 23 n.26.  However, the Complaints allege Defendants' then-existing intent not to properly transfer title, and their consistent failure to do so.  TIAA ¶223; Dexia ¶274.[32]

### C.   The Complaints Adequately Plead Scienter

Deutsche Bank devotes less than a page to scienter in a half-hearted attempt to recycle the same arguments which were rejected by the Court in the DB Order.[33]  This effort fails again.

---

[32] *See Stichting v. Credit Suisse*, 2012 WL 6929336, at \*12 (sustaining title transfer claims); *ACE*, Tr. at 89-90 (same); *Prudential*, 2013 WL 1431680, at \*7 (same). *627 Acquisition Co. v. 627 Greenwich, LLC*, 85 A.D.3d 645 (1st Dep't 2011), DB 23, n.26, involved an unsupported allegation that a party to a contract had a secret intention not to perform. In *Landes v. Sullivan*, 235 A.D.2d 657, 660 (3d Dep't 1997), plaintiff's alleged promise was not recorded in the contract.  In *Dexia Holdings, Inc. v. Countrywide Fin. Corp.*, 2012 WL 1798997, at \*5 (C.D.Cal. Feb. 17, 2012), unlike here, the complaint did not identify the statements at issue.

[33] To the extent that Defendants simply regurgitate arguments they made previously, DB 28-30, the Court should reject those arguments for the reasons stated in Plaintiffs' prior briefs.

First, Deutsche Bank argues that "plaintiffs' allegations concerning Greg Lippmann do not support the proposition that Lippmann possessed undisclosed knowledge about problems with the Underlying Loans." DB 28. Defendants are wrong. The Complaints detail how Lippmann knew the true quality of the Certificates, citing the "strictly confidential" Shorting Report and his emails, TIAA ¶¶81-85 & Dexia ¶¶89-93; his blacklisting of the relevant originators, TIAA ¶122 & Dexia ¶130 (Fremont is "bad," "a pig," "blowing up," New Century is an "absolute pig," American Home is a "bad name"); Lippmann's especially negative views about the ACE shelf, including his specific degradation of some of Dexia's RMBS, TIAA ¶123 & Dexia ¶131 (ACE is a "bad name," "not good," "generally horrible," ACE 2006-ASAP3 "stinks though I didn't mention it," ACE 2006-HE2 is "a pig"); Deutsche Bank's offloading of DBALT, including Dexia's DBALT 2006-AR6, into CDOs, TIAA ¶119 & Dexia ¶134; and Lippmann's amassing a $10 billion short position, TIAA ¶119 & Dexia ¶126. The Complaints further detail how Deutsche Bank's traders shared their shorting strategy with only a few clients in confidence, precisely so that it could continue to sell RMBS to investors like TIAA and FSAM. TIAA ¶127 & Dexia ¶135. Indeed, as Lippmann wrote to one favored client: "please please do not forward these emails outside of your firm….I do not want to be blamed by the new issue people for destroying their business." TIAA ¶129 & Dexia ¶137; *see also id.* ("Customer happiness is a secondary goal but we cannot lose sight of the trading desk['s] other role of supporting new issue"). Significantly, the Court has already found that Plaintiffs ***"can rely on Lippmann and the Shorting Report in their amended complaints."*** DB Order, at *7.

Defendants are also wrong to claim that Plaintiffs must identify the Clayton reports regarding the specific trusts backing the Certificates. DB 16. Such detail is simply not necessary

at the pleading stage.[34] Moreover, the Complaints identify the types of reports; who received them; what they contained; and testimony from Clayton and Deutsche Bank insiders and CWs demonstrating that "it was company policy to circumvent the underwriting guidelines," all of which is bolstered by Plaintiffs' forensic loan-level analysis.  TIAA ¶¶55-62, 199-229; Dexia ¶¶62-69, 250-80.   *See Allstate v. CW*, at 1187 (scienter inferred from substantially similar allegations).  Indeed, the Court specifically credited Plaintiffs' allegations regarding Clayton's findings when noting that Plaintiffs "might well be able to state a claim." DB Order, at *7.[35]

Finally, Deutsche Bank contends that its access to "raw data" about various lenders, including through its ownership of MortgageIT and DB Home, and its relationships with warehouse lenders, is insufficient to demonstrate its knowledge of the infirmities that infected the loans.  DB 29.  But Plaintiffs allege far more than access to granular data or a "mere parent-subsidiary relationship" with mortgage lenders. *Id.* The Complaints detail how Defendants were constantly apprised of fraud problems at MortgageIT, TIAA ¶¶87-93, Dexia ¶¶95-101; and they stripped MortgageIT of its ***only*** quality control officer responsible for reviewing closed loan files. TIAA ¶90-91; Dexia ¶¶98-99. They also maintained "detailed knowledge" of the operations of warehouse lenders to which they had extended billions of dollars, TIAA ¶100, Dexia ¶108, including, for example, that New Century had "no standard for loan quality," TIAA

---

[34] Rather, allegations of systematic underwriting deficiencies, coupled with allegations of poor performance of specific RMBS, are sufficient to plead that those RMBS were affected by those deficiencies. *See, e.g.*, JPM Order, at *4; *Chase*, 2012 WL 5395646, at *5-8, 10; *Credit Suisse*, 2012 WL 6929336, at *10 (collecting cases).

[35] *Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co.*, 2012 WL 1352590 (2d Cir. Apr. 19, 2012), DB 29, involved a Clayton report that the court believed had been prepared after the securities had issued.  Here, the Complaints allege that Defendants received ***daily*** and ***weekly*** Clayton reports while the securities were being assembled.  TIAA ¶55; Dexia ¶62; *see Chase*, 2012 WL 5395646, at *n.15 (distinguishing *LBBW* on this basis); *Dodona I v. Goldman Sachs*, 847 F. Supp. 2d 624, 643 (S.D.N.Y. 2012) (distinguishing *LBBW* where complaint, as here, includes internal company documents disparaging the securities at issue).

¶148, Dexia ¶191. *See Abu Dhabi*, 651 F. Supp. 2d at 178 (inferring that investment bank had knowledge of New Century's lending practices due to its status as a large creditor).

Here, there can be no serious question that the Complaints' allegations are more than enough to create a "strong inference" of scienter. *See, e.g.*, JPM Order, at *7 (scienter sufficiently pled on virtually identical allegations that defendants (1) pressured and provided faulty data to the CRAs; (2) knew that the loans backing the RMBS did not comply with guidelines and "waived in" noncomplying loans; and (3) numerous CWs corroborated allegation that defendants knew that the mortgages included in the loan pools were not as represented).[36]

### D.    The Complaints Adequately Plead Loss Causation

Loss causation is pled if it is foreseeable that a plaintiff would suffer loss as a result of relying on the alleged misrepresentations. *See MBIA v. Countrywide*, 928 N.Y.S. 2d at 235; *Chase*, 2012 WL 5395646, at *18 (same). Here, it was entirely foreseeable that securitizing loans into RMBS without regard for the borrowers' ability to repay would result in rampant defaults. TIAA ¶¶11-15, 59; Dexia ¶¶11-15, 55. Defendants even bet this would happen. TIAA ¶132; Dexia ¶140. As a result, the RMBS were worth less than the price paid by TIAA and FSAM. TIAA ¶¶261-62; Dexia ¶¶313-14. Defendants devote three sentences to an argument that Plaintiffs must plead facts sufficient to exclude the mortgage crisis as the cause of their losses. DB 29. This Court and others have repeatedly rejected this argument. *See, e.g.*, JPM Order, at *9. Further, Defendants' conduct was, at a minimum, a contributing factor in causing the crisis.[37]

---

[36] *See also Chase*, 2012 WL 5395646, at *11-12 (scienter sufficiently pled on (1) substantially similar allegations demonstrating falsity; (2) Clayton reports; and (3) JPMorgan's relationship with its mortgage-origination subsidiary); *Dodona I*, 847 F. Supp. 2d at 642-43 (scienter pled based on (1) defendant's due diligence; (2) Clayton reports; (3) comments from traders recognizing the weaknesses inherent in MBS; and (4) the defendant's MBS shorting strategy).

[37] *See Allstate v. DB*, at 20-21; *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 190 (2d Cir. 2001); *In re Ambac Fin. Grp. Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 270 (S.D.N.Y. 2010).

## II.     Plaintiffs Have Stated A Claim For Negligent Misrepresentation

Negligent misrepresentation requires, *inter alia*, that the defendant had a duty as a result of a special relationship to give correct information. *See IKB Deutsche*, 2012 WL 1592193, at *6. Defendants baldly assert that Plaintiffs' allegations are "insufficient to plead a 'special relationship.'" DB 30. However, a "special relationship" is adequately pled on allegations that "defendants initiated contact with plaintiffs, induced them to forebear from performing their own due diligence, and repeatedly vouched for the veracity of the allegedly deceptive information." *Suez,* 250 F.3d at 103.  Here, DBSI provided TIAA and FSAM with the Offering Materials knowing that they would rely on Deutsche Bank's misrepresentations, and that they lacked access to the loan files and internal due diligence reports. Such allegations easily allege a special relationship.  At best, this is not a question for the pleadings.  *See* JPM Order, at *10.

## III.    Dexia Has Standing To Bring This Action

### A.     DCL Has Standing As FSAM's Assignee

The Dexia Complaint alleges that FSAM conveyed "all right, title and interest in the [Certificates]" to DCL, including any and all tort claims.  In addition, the intent of the parties was to assign all rights, including the tort claims alleged herein.  Nothing more is required.  *See* JPM Order, at *10, fn. 9.

Contrary to Defendants' assertions, New York law ***does not*** require an explicit assignment of fraud claims.  *North Fork Bank v. Cohen & Krassner,* 44 A.D.3d 375 (1st Dept. 2007) is instructive.  There, the First Department held that North Fork's assignment of "'all rights, title and interest in and to ***the mortgage***' for full value prior to institution of [the] action" was sufficient to assign its fraud claims.  *Id.* at 375.  *See also Stewardship Credit Arbitrage Fund LLC v. Charles Zucker Culture Pearl Corp.*, 2011 WL 1744217, at *5 (Sup. Ct. May 4, 2011) (language assigning "all rights and interests" in a loan and related documents held sufficient to

assign tort claims); *Algonquin Power Income Fund v. Christine Falls of N.Y.*, 2013 WL 336002, at *4 (2d Cir. Jan. 30, 2013) (citing with approval *RTC Mortg. Trust 1994 N-1 v. Fidelity Nat'l. Title Ins. Co.*, 16 F. Supp. 2d 557 (D.N.J. 1998) (assignment of all right, title, and interest in and to mortgage loans, all mortgage documents and all mortgage proceeds assigned tort claims)); *Pro Bono Invs., Inc. v. Gerry*, 2008 WL 4755760, at *17-18 (S.D.N.Y. Oct. 29, 2008) (language that "all assets standing in the name of ... [assignor], are hereby assigned, transferred and conveyed to [assignee]" assigned claims); *Int'l Design Concepts LLC v. Saks Inc.*, 486 F. Supp. 2d 229, 237 (S.D.N.Y. 2007) ("assignment of 'all assets of [assignor]' is broad enough to encompass all causes of action owned by [assignor]").

Defendants' previous claim that a transfer of "all right, title and interest" in an asset is insufficient as a matter of law to assign related fraud claims (ECF No. 46 at 1-2) is unsupported. *North Fork* and *Stewardship* both hold that a transfer of all right, title and interest in an asset can reasonably be read to include an assignment of tort claims.[38]   Given the dispute between Plaintiffs' and Defendants' interpretations, the Put Contract is ambiguous as to whether it included an assignment of FSAM's related tort claims and, as such, parole evidence of intent must be considered.  *See JA Apparel Corp. v. Abboud*, 568 F.3d 390, 399 (2d Cir. 2009) (court should have considered extrinsic evidence of the parties' intent because language conveying all rights, title and interest in "names, trademarks, trade names …" was susceptible to conflicting interpretations); *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 430 (2d Cir. 1992) (contract held ambiguous because "susceptible to several reasonable interpretations").[39]

---

[38] This Court has acknowledged that arguments challenging Plaintiffs' standing "raise difficult issues of state law that are more appropriately decided by a state court."  *Dexia SA/NV v. Bear Stearns et al.*, 12-cv-4761 (JSR) (S.D.N.Y. May 17, 2013), ECF No. 68 at 9-10.

[39] Defendants' contention that the Put Contract was not before the Court when it issued the February 6, 2012 Order is wrong.  In fact, Defendants themselves submitted the Put Contract to

Here, extrinsic evidence cited in the Complaint shows that FSAM intended to assign its tort claims to DCL when it transferred the Certificates pursuant to the Put Contract.  ¶¶22-24.[40] Moreover, the April 24, 2013 letter agreement among FSAM, DCL and Dexia SA confirms and ratifies the mutual intent of FSAM and DCL to transfer the claims:

> For the avoidance of doubt, FSAM, DCL, and Dexia hereby ratify and confirm that (i) in connection with the delivery by FSAM to DCL of Put Portfolio Assets pursuant to exercises of Put Options and Call Options under the Put Contracts, *FSAM transferred, assigned and delivered to DCL all of FSAM's rights to and under all claims with respect to the Put Portfolio Assets, including, without limitation, any and all claims, suits, and/or causes of action arising under or relating to the Certificates and/or FSAM's purchase of the Certificates …*

Ratification, at 4; Wales Ex. A ¶23A.[41]  The Court cannot resolve this ambiguity at this stage. *See Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 574 (2d Cir. 1993) ("resolving an ambiguous term in a written contract through extrinsic evidence remains squarely within the province of the trier of fact").[42]

Defendants' cited cases are inapposite.  In *Banque Arabe*, the Second Circuit only noted that the transfer of all rights, title and interest in the participation agreement at issue there "*may be* deemed insufficient" to transfer claims.  *See Banque Arabe*, 57 F.3d at 152 (emphasis added). In *North Fork,* the First Department considered *Banque Arabe* and held that a transfer of all

---

the Court on December 15, 2011.  ECF No. 46, Appendix A.

[40] The extrinsic evidence will also show that DCL did not include language conveying all right, title and interest in documentation of sales of the Certificates at issue to unrelated third parties.

[41] Under New York law, parties can retroactively clarify a contract, and "their agreement will be enforced even if the rights of a third party are affected, unless the third party can show that it changed its position in reliance on the agreement as originally written."  *Fed. Ins. Co. v. Am. Ins. Co.*, 258 A.D.2d 39, 45 (1st Dept. 1999). Defendants cannot show that they changed their position in reliance on the Put Contract.  *See Coakley v. N.Y.*, 196 N.Y.S.2d 793, 796 (N.Y. Ct. Cl. 1960).

[42] In any event, because FSAM and DCL are both plaintiffs here, Defendants suffer no prejudice if the case proceeds.  *See Rosenblum v. Dingfelder*, 111 F.2d 406, 407 (2d Cir. 1940) ("Since the claim is owned and may be sued upon by someone, all a defendant may properly ask is such a party plaintiff as will render the judgment final and *res adjudicata* of the right sued upon").

rights, title and interest in a mortgage *is* sufficient to assign related fraud claims.  *See* 44 A.D.3d at 375 (citing *Banque Arabe*, 57 F.3d at 152).

*CALPERS* presented a unique set of facts and is likewise inapposite.  There, the New York Court of Appeals held that an initial assignment of all right, title and interest in a loan agreement did not include claims arising out of a separate professional services agreement with a third party, and that a subsequent assignment of claims arising under the professional services agreement was invalid because the assignor had, by the time of the second assignment, already been compensated for its claims.  *See Cal. Pub. Emps.' Ret. Sys. v. Shearman & Sterling*, 95 N.Y.2d 427, 436 (2000) ("*CALPERS*").  Critically, the Court did not hold that the assignment of all right, title and interest in the loan agreement was invalid or limited to an assignment of contractual claims.  *See id.*  Justice Fried recently distinguished *CALPERS* as inapplicable, relying upon the First Department's decision in *North Fork* issued seven years after *CALPERS*.  *See Stewardship*, 2011 WL 1744217 at *4 (finding that assignee could maintain a fraud claim even though the assignor was paid full value for the assignment).

In sum, FSAM assigned the tort claims alleged in the Action to DCL when it transferred all rights, title and interest in the Certificates pursuant to the Put Contract.  Thus, DCL has sufficiently alleged standing to pursue the fraud claims here.  *See Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 285 (2008).  Given the intent of the agreement and the authorities cited by Plaintiffs, the motion to dismiss should be denied.

## B.    The Court Should Grant Dexia Leave To Supplement The Complaint

The Dexia Plaintiffs respectfully request leave to supplement their complaint pursuant to Rule 15(d) to address events after the date of the amended complaint.  *See* Fed. R. Civ. P. 15(d) ("On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the

date of the pleading to be supplemented"). "The underlying purpose of Rule 15 is 'to facilitate a decision on the merits, rather than on the pleadings or technicalities.'" *Rivera v. Dyett*, 1993 WL 54652, at *3 (S.D.N.Y. Feb. 16, 1993).

"Absent undue delay, bad faith, dilatory tactics, undue prejudice to the party to be served with the proposed pleading, or futility, the motion should be freely granted." *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 66 (2d Cir. 1995). "The party opposing the motion bears the burden of establishing that an amendment would be prejudicial or futile." *Riverhead*, 881 F. Supp. 2d at 379. Here, none of the factors militating against granting leave apply.

On April 3, 2013, this Court issued a bottom-line order in Dexia's case against JPMorgan, partially granting and partially denying summary judgment. *See* 12 Civ. 4761, ECF No. 56. On May 17, 2013, this Court vacated the Order for lack of jurisdiction, noting that its partial grant of summary judgment was based on a determination that FSAM did not validly assign its claims. *See id.*, ECF No. 68, at 9. To address this, and to remove any conceivable doubt about the parties' respective intent to assign fraud claims from FSAM to DCL, Plaintiffs FSAM, DCL and Dexia SA entered into a letter agreement dated April 24, 2013 confirming and ratifying the parties' intent to assign FSAM's tort claims to DCL pursuant to the Put Contract. The agreement is incorporated into the proposed supplemental complaint.

There was no undue delay in seeking leave to supplement. Nor is this a case of bad faith or dilatory tactics. On two separate occasions, this Court found – after review of the Put Contract – that Dexia's claims "need not be [] dismissed on standing grounds at this stage of the litigation." ECF No. 49 at 2. *See also* 12 Civ. 4761, ECF No. 52, at 24, n 9 (denying motion to dismiss because "[t]he Amended Complaint alleges that FSAM assigned 'all right, title, and interest' in the RMBS assets (including all rights and remedies sought in this action)'"). Upon

receipt of the first indication from the Court that the Put Contract might be insufficient on April 3, 2013, Plaintiffs promptly entered into the April 24, 2013 letter agreement.  Granting leave to supplement also does not prejudice Defendants.  The supplemental complaint allows this Court to rule on the validity of FSAM's assignment based on more developed allegations.  Moreover, it is still early in the case and Defendants have had ample notice of Dexia's claims (which have not changed).  *See Quaratino*, 71 F.3d at 66 ("Leave is normally granted, especially when the opposing party is not prejudiced by the supplemental pleading").

### C.     DCL Has Standing As FSAM's Equitable Subrogee

DCL also has standing to bring claims as FSAM's equitable subrogee. Under New York law, subrogation includes "every instance in which one party pays a debt for which another is primarily answerable and which in equity and good conscience should have been discharged by the latter so long as the payment was made either under compulsion or for the protection of some interest of the party making the payment and in discharge of an existing liability." *Hamlet at Willow Creek Dev. Co. v. Ne. Land Dev. Co.*, 64 A.D.3d 85, 105-06 (2d Dep't 2009).

Here, DCL's payments to FSAM were made both under compulsion and for the protection of DCL's interests.  First, as contractually required, DCL paid FSAM the outstanding principal amount plus accrued interest of Certificates that were transferred from FSAM to DCL. *See* Wales Ex. A ¶23A; Ratification §9.  DCL's payments exceeded the Certificates' market value because the Certificates were much riskier than Defendants represented at the time of FSAM's purchase.  Second, the transfer of the Certificates from FSAM to DCL, and DCL's corresponding payments, were part of an effort to mitigate DCL's losses.  Thus, DCL made the contractually required payments to protect its own interests.  *See* Ratification §1.

The difference between the amount DCL paid and the market value included Defendants' liability resulting from their fraudulent securitization and sale of the Certificates. Thus, DCL

involuntarily satisfied Defendants' liability to FSAM and is an equitable subrogee. *See Hamlet*, 64 A.D.3d at 106 (finding equitable subrogation because "[i]n satisfying [obligor's] obligation to the Town, the Hamlet acted under compulsion or for the protection of some interest"); *Perez v. Fiore*, 78 A.D.3d 1143, 1144 (2d Dept. 2010) (finding equitable subrogation where plaintiff cured a mortgage default to protect his ownership interest in the property).[43]

Defendants' assertion that DCL is not an equitable subrogee because "there is simply nothing inequitable," DB 34, is wrong. Defendants' scheme to create, issue and sell RMBS backed by poor quality loans as purportedly safe, AAA-rated investments necessitated the intra-company agreements in the first place.  It would be inequitable if the Plaintiffs that bore huge losses resulting from Defendants' scheme while protecting FSAM and Plaintiffs' collective interests could not pursue remedies against Defendants. Indeed, to allow Deutsche Bank, the wrongdoer, to escape liability due to a technicality would contravene the fundamental principles underlying the doctrine of equity. As such, equity provides Plaintiffs with a remedy. Defendants' claim that DCL had the option to pay FSAM market value, DB 34, is contradicted by the December 15, 2011 Declaration of Jonathan Peterson (ECF No. 48) ¶8.  *See also* Ratification §4 (stating that "Dexia and DCL did not have the right to cause a sale by FSAM of a Put Portfolio Asset subject to the Guaranteed Put at its market value"). Nor are Defendants correct that they did not owe a debt to FSAM when DCL paid the outstanding principal amount plus accrued interest for transferred Certificates.  FSAM's claims accrued – and Defendants owed a debt – when Defendants fraudulently sold RMBS that were worth much less than represented. *See Carbon Cap. Mgmt. LLC v. Am. Exp. Co.*, 88 A.D.3d 933, 939 (2d Dep't 2011).

---

[43] *See also Gerseta Corp. v. Equitable Trust Co. of N.Y.*, 241 N.Y. 418, 425-26 (1926) (finding equitable subrogation where plaintiff paid a debt under compulsion and to protect itself, thereby reducing the defendants' indebtedness to the bank).

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety.

In the alternative, Plaintiffs request leave to amend.[44]

Dated:  New York, New York
          May 31, 2013


          **BERNSTEIN LITOWITZ BERGER
          & GROSSMANN LLP**

          /s/ David L. Wales
          _____

          David L. Wales
          Lauren A. McMillen
          Rebecca E. Boon
          Katherine A. Stefanou

          1285 Avenue of the Americas, 38th Floor
          New York, NY 10019
          Tel:    (212) 554-1400
          Fax:    (212) 554-1444

          dwales@blbglaw.com
          laurenm@blbglaw.com
          rebecca.boon@blbglaw.com
          katherine.stefanou@blbglaw.com

          *Attorneys for Plaintiffs Dexia SA/NV, Dexia Holdings,
          Inc., FSA Asset Management, Inc., Dexia Crédit Local
          SA, and Teachers Insurance and Annuity Association of
          America*

---

[44] "The court should freely give [leave to amend] when justice so requires." Fed. R. Civ. P. 15(a).